UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. S1-4:02CR00557 CEJ (AGF) |
| | ) | |
| ROBERT BOLDEN, SR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE
PERTAINING TO EVIDENTIARY ISSUES**

This matter is before the Court on the pretrial motions of the defendant, Robert Bolden, Sr. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). The defendant filed two evidentiary motions: a motion to suppress identification testimony (Dkt. No. 70), and a motion to suppress evidence and statements (Dkt. No. 73). The government filed a motion for an order regarding the admissibility of statements (Dkt. No. 35).[1]

In the motion to suppress identification testimony, defendant moved to suppress lineup identifications made by three eyewitnesses. In his motion to suppress evidence and statements, defendant moved to suppress the following:

• Statements made by defendant Bolden at police headquarters on October 7, 2002;

• Consent to search given on October 8, following defendant's arrest;

_____

[1] Defendant's non-evidentiary motions and the government's motion for discovery of mental health evidence are addressed in separate orders.

- Evidence obtained during a search of the Howell residence on October 8, 2002;

- Statements made by defendant Bolden following a search of 1157 Howell; and

- The seizure of a firearm from the Howell residence on January 16, 2003.

Although not directly challenged by defendant, the Court will also address briefly the following:

- Statements made by defendant Bolden at 1157 Howell prior to his arrest;

- The seizure and search of defendant's car on October 7, 2002;

- The search of defendant's son's room on October 7, 2002;

- A buccal swab taken of defendant; and

- The consent to search the Howell residence on January 22, 2003.

Evidentiary hearings were held on February 25, March 6, November 10-11, and December 5, 2003. The government was represented by Assistant United States Attorneys Steven E. Holtshouser and Michael A. Reilly. The defendant was present and represented by his appointed counsel, Assistant Federal Public Defender Kevin C. Curran and attorney Christopher E. McGraugh. The following witnesses testified at the hearings:[2]

- Detective Tracy Chaney,[3] a detective with the North Patrol Detective Bureau of

_____

[2] The defendant had also proposed to offer the expert testimony of Dr. Michael Leippe regarding the eyewitness identification, and the government proposed to offer expert testimony in rebuttal, however, on the day of the proposed testimony, the defendant withdrew his request to call Dr. Leippe, and the government accordingly did not call its rebuttal expert.

[3] On motion of the government, Det. Chaney's testimony was taken both in connection with the motion to suppress and to preserve his testimony for trial, as Det. Chaney was in the

the St. Louis Metropolitan Police Department, and who has been a police officer for nine years;

- Officer Doug Eathearton, an evidence technician assigned to the laboratory identification division of the St. Louis Metropolitan Police Department, and who had been a police officer for 16 years;

- Detective Jeffrey Stone, a detective in the homicide section of the St. Louis Metropolitan Police Department, and who has been a police officer for approximately 18 years;[4]

- Detective Mathias Hanewinkel, a detective in the homicide section of the St. Louis Metropolitan Police Department, and who has been a police officer for approximately 14 years;

- Special Agent Terrence McGinnis, an agent employed with the Federal Bureau of Investigation;

- Three eyewitnesses to the shooting incident: Ms. Jeanne Coser, Mr. Henry Wines, and Ms. Erica Ruffin;

- Det. Alan Carroll, a detective in the homicide section of the St. Louis Metropolitan Police Department, and who has been a police officer for over 14 years; and

- Ms. Beverly Granberry, who was the defendant's landlord.

Both parties thereafter filed post-hearing memoranda.

Based on the testimony and evidence adduced, and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

---

Army Reserves and was called to active duty and scheduled to report to active duty on February 26, 2003, the day after his testimony was taken.

[4] Det. Stone testified on March 6, 2003 and on November 10, 2003.

# FINDINGS OF FACT

On October 7, 2002, a shooting occurred in front of the Bank of America branch bank (the "Bank") at 9075 Goodfellow. An individual who was allegedly attempting to enter the bank in order to rob it struggled with the security guard, Nathan Ley, and then shot him twice and killed him. The defendant, Robert Bolden, Sr., was identified as the shooter. Corteze Edwards and Dominick Price, who were allegedly at the bank with the defendant, were also charged in connection with the incident.

The bank is located at what is commonly known as the Halls Ferry or Riverview Circle. Govt. Ex. 1 (bank parking lot marked with circle). The C & W Chop Suey restaurant ("C & W") is also located off the Halls Ferry Circle, just north of the bank and directly across Goodfellow. See Govt. Ex. 1 (marked with "C & W"). There is an abandoned building next to the C & W.

## The Eyewitness Testimony

The events that transpired outside the bank were viewed by three eyewitnesses: Jeanne Coser, Henry Wines, and Erica Ruffin.

### i. Jeanne Coser

Jeanne Coser is a 36-year-old Caucasian female. She is a high school graduate who has been employed with UPS for the past seven years as a sorter and bagger. Her job requires that she use her memory daily, to sort a large number of zip codes and cities into their appropriate bins. She also works as a driver and has to be familiar with the area streets. She is married, with four teenage children. She has 20/20 vision and does not

wear contacts or glasses. Ms. Coser grew up in the City of St. Louis, in Baden, and has since returned to living there. The Baden area was racially mixed when she was growing up, and she had friends and neighbors who were African-American. The area now has a greater percentage of African-Americans than Caucasians. Where Ms. Coser works also has an even racial mix. Ms. Coser has had some experience with firearms. Years ago her husband owned a .22 automatic pistol, which she held and fired a few times. She did not particularly enjoy handling the firearm, but it did not bother her, and she is not afraid to hold or fire a pistol and is familiar with firearm safety issues.

On October 7, 2002, Ms. Coser was on vacation from work, and she was well rested that day. At that time, Ms. Coser was living in Warrenton. She had gone to visit her mother in Baden that day and was going to leave her youngest child to visit with her. Ms. Coser's mother does not drive, and she had driven her mother to the bank so that she could access her safe deposit box. Ms. Coser waited in the parking lot while her mother went inside the bank. She was driving a white Chevy Corsica and was parked in the bank parking lot, three spaces from the bank entrance, just to the left of the doors, with the driver's side of the car nearest the front of the bank. See Govt. Ex. 26. She knew that there was always a guard posted outside or inside the bank, but as she waited she had not particularly noticed the guard that day. It was a nice and clear day outside, and she had the windows rolled down. She reclined the seat a bit and relaxed for a minute, and then sat back up to smoke a cigarette. Up to that point in time, she had not noticed anything unusual.

Ms. Coser then heard some commotion, like an argument, coming from her left, which was toward the front of the bank. She could not hear the words, but they were male voices, and they sounded angry or aggressive. She looked to her left and saw the bank guard and a black man struggling or fighting in front of the bank. She did not see what led to the conflict. The two men were on the sidewalk in front of the bank, just to the right of the front doors, which was catty-corner to where she was – in front and to the left – approximately 20 feet away. Initially and during most of the struggle, the guard's back was to her, and the other man was facing her. As they struggled, however, the angle changed often, such that at times the black man was fully facing toward her. At times she saw him from the side, and at times the guard's body obstructed her view of the other man. The sun was behind her and toward the right, and the two men were in the shade. There was nothing between Ms. Coser and the two men obstructing her view. She recognized that she was seeing a life-and-death struggle, and her attention was very intently focused on the two men struggling.

She observed that the black man's hand was moving, and that he had a firearm in his right hand, and the bank guard had a hold on the man's wrist that was holding the gun. The gun appeared to be real. It appeared the guard was trying to get control of the other man. She believed that the struggle lasted for maybe 2-3 minutes, but to her it seemed like forever. Then she heard a shot. It appeared that the bank guard had been hit, and the guard's left hand started shaking. At this point, the guard's back was somewhat toward her, and the black man was facing her. The black man broke away and stepped

back.  The guard was still standing, but was not making any movement forward.  She thought they were about one foot apart.  The black man raised his hand, with the gun pointed toward the guard's head, and fired a second shot.  She saw the shot hit the guard's head and saw the guard stumble and fall.  The shooter ran through the lot, behind the cars that were parked directly in front of hers.  As he passed her, he was approximately one car length away.  As the shooter ran through the lot, Ms. Coser lost sight of him momentarily, but then saw him as he ran across Goodfellow and then up across Riverview.  She was watching to see if he got into a car, as she hoped to get his license.  She watched as he crossed Goodfellow, toward the C & W restaurant, and lost sight of him as he disappeared behind the building.

During the incident, Ms. Coser felt scared.  She felt more threatened or worried for her safety while the man was running through the lot after the shooting, but she no longer saw the gun when he was running through the lot, and the gun was never pointed toward her.  She testified that despite her fear, she kept her focus on the incident and the shooter.  She tried to watch to get information for the police even as he ran away.  She realized that she might need to be a witness.  She said she had seen the shooter's face too many times to count and felt she had taken in the shooter's face and taken note of his physical makeup.  She felt she could pick him out if she saw him again.

Ms. Coser ran to help the guard, and others came to help as well.  The guard was still alive at this point and appeared to be attempting to sit up and get his firearm from his holster.  He was breathing and struggling and trying to speak, but was not

comprehensible. She and others were holding him down. When the police and ambulance arrived, she and the others let them take over. She was covered in the bank guard's blood.

Numerous police officers, including Det. Chaney, were called to the scene. Ms. Coser advised the police that she had seen what happened. She and the others were taken into the bank. She initially spoke to a male police officer, who was not otherwise identified at the hearing, and gave him a description of the shooter and what she had seen. As she was speaking, other individuals were interrupting and injecting what they had seen. She did not recall any descriptions given by the others. Approximately one-half hour after the shooting, Ms. Coser was interviewed by two detectives, a male and a female. The interview took place in an office in the bank, and no other witnesses were present. A few minutes later she also gave an interview to an FBI agent in the same office. She believed that she gave the same description to each of the officers and agents.

The police report reflects that Ms. Coser described the defendant as a black male; early to mid-20s; 5' 4" tall, noting that he was much shorter than the guard; medium build; medium complexion; heavily unshaven, described as a few days' growth; wearing a blue winter skull cap, dark sweat jacket with a zipper but no hood and what appeared to be a green shirt underneath, and blue denim pants; and hair that was a medium-length Afro that stuck out from his cap in the back and on the sides. Govt. Ex. 20. Ms. Coser had not seen the description listed in the police report until October 30, 2003, when she

saw it in preparation for the hearing, and she testified that some of the information in the police report regarding her description of the shooter's age and height was incorrect. She said she advised the police that the shooter was mid-30s to 40 years old, and that she told them *she* was 5' 4" tall and that the shooter was about two inches taller than she. She also thought that the sweatshirt had a hood, and she might have told that to the police, but the hood was never on the shooter's head. She said she brought these inconsistencies to the attention of the prosecutor during her preparation for the hearing. Otherwise, the description reflected in the police report properly reflected the description that she gave. She did not notice any visible scars or other markings on the defendant's face.

After speaking with the police, Ms. Coser took her mom home and then drove back to Warrenton. She had been crying in the bank and began crying again when she got home. After the incident, she had nightmares and trouble sleeping, but that had stopped until this came back up again relating to the hearing. She said she did not feel she could erase she shooter's face from her memory.

ii. <u>Henry Wines</u>

Henry Wines is a 60-year-old black male. He is a high school graduate who is currently self-employed in the construction and remodeling industry. Prior to his retirement in 1992, Mr. Wines was a corrections officer for the City of St. Louis. He was a lieutenant when he retired, assigned to the medium security institution. In his job he was required to use his memory, as he needed to verify that the individuals in the institution were in the right bunks, and that the right individuals were being released. As

a corrections officer Mr. Wines did not carry a firearm, but during this time period he also worked a secondary job as a security guard, at which he did carry a firearm, which he still owns.  Mr. Wines does not need to wear any glasses to see distances clearly, but he does need glasses for reading.

On the afternoon of October 7, 2002, Mr. Wines was at the Baden branch bank to conduct some personal banking business.  As he was leaving the bank, he stopped and spoke to the security guard outside, commenting on what a beautiful day it was.  He had been at the bank many times and noticed that the security guard was not the one who was usually there.  After this conversation, Mr. Wines walked to his truck, which appears as the large white truck on the left side of the photograph that is marked as Govt. Ex. 26.  As he got to his truck, Mr. Wines apparently encountered one of the other individuals involved in the incident.  A man stood up on near the rear of Mr. Wines's truck, on the opposite, passenger side.  The man was wearing what appeared to be a black and white mask that looked like a dog head, and he appeared to be about the same height as Mr. Wines, 5' 10".  Mr. Wines said loudly, "What the f--- are you doing?" and made a motion with his hands as though he were moving for a weapon.  The man went behind the truck and disappeared.

Soon thereafter he heard another person say, "Give it up, give it up," in a forceful voice that appeared to be coming from the direction of the bank.  At first he thought, "damn, there's two of them," and he thought maybe he was going to be robbed.  He turned toward the sound and saw the bank guard scuffling with another individual.  At

this point he realized he was not about to be robbed.  There was nothing obstructing his view of the two men.  The scuffle was taking place near the doors to the bank, at an angle to the front and to the right of where Mr. Wines was standing.  He recognized the guard as the individual with whom he had spoken earlier.  Although Mr. Wines had not seen the other man prior to that day, he recognized the man struggling with the guard as an individual he had seen walking from the lot toward the bank as Mr. Wines was leaving the bank.  When he first saw him, the man had been near the front of Mr. Wines' truck, but he had not seen where he had come from.  He could see that the man who was struggling with the guard had a gun.  It appeared to Mr. Wines that the man was attempting to get the guard's gun, and that the guard was fighting the man off.  He did not see the guard holding the man's gun hand.  A few seconds later a shot was fired, and Mr. Wines saw the bank guard back up and could tell that he had been shot.  A few seconds thereafter, the man fired a second shot, as the guard was falling down from the first shot.  The two men were standing fairly close to one another when the second shot was fired, and the shooter was moving back.  Mr. Wines saw the bank guard fall.

Mr. Wines then saw the shooter put the gun under his sweatshirt, turn, and walk away.  He walked past the front of Mr. Wines' truck while Mr. Wines was still standing there at the driver's side.  Mr. Wines made eye contact with the individual, and he was staring at the man.  He did not feel at that moment that he was in personal danger; he felt as though the shooter was moving away.  After the shooter passed Mr. Wines' truck, he saw him cross Goodfellow toward the C&W restaurant, at which point he was out of Mr.

Wines' sight.  At that point, Mr. Wines felt he could identify the man if he saw him again.

Mr. Wines called 911 on his cell phone and had trouble getting through.  He was put through to St. Louis County and was frustrated trying to get them to understand this was in the City.  He was aggressively attempting to convey the situation to the 911 personnel.  Thereafter, Mr. Wines went to the end of the lot, near the circle.  He was trying to keep the area open, as people were still trying to come to the bank, and was watching for the police in order to direct them to the right place.

After the police arrived and the guard was taken away in an ambulance, an officer came up to Mr. Wines and asked if he had seen anything.  Within a few minutes, the police asked him what direction the men had gone but did not otherwise discuss any specifics with him.  Mr. Wines was taken into the bank and interviewed alone by two detectives.  He did not talk to any other witnesses prior to this interview, nor did he hear what any other witnesses said.  He gave the officers a description of the shooter, which is accurately summarized on Govt. Ex. 21.  He described the shooter as a black male, 20-25 years old, approximately 5' 5" tall, 120-130 pounds, with black hair that was twisted, wearing a green sweatshirt and blue jeans.  Mr. Wines thought that at some point he had also talked to an FBI agent, but he was not sure whether it was that day or when he returned to the bank to speak with the prosecutors about one month later.  After the interview at the bank, Mr. Wines was allowed to leave, and he drove home.

     iii.  <u>Jessica Ruffin</u>

Jessica Ruffin is an adult, African-American woman who works as a security officer. At the time of the event, she was employed with Pinkerton Environs. Her job was to protect the property of her clients. Her instructions, if she witnessed anything out of the ordinary, were to first attempt to get a description, and then to call the police. She was familiar with firearms, as her father owned three firearms, and her sister, whom she sees regularly, is a uniformed police officer for the City of St. Louis, who wears a firearm. Ms. Ruffin wears eyeglasses that correct her vision to 20/20, and she was wearing her eyeglasses on the date in question.

On October 7, 2002, Ms. Ruffin went to the Nance Elementary School, in the 9000 block of Goodfellow, to pick up her five-year-old nephew. The elementary school is across the street from the C & W restaurant. She arrived around 2:45 or 2:50 p.m. and parked between the C & W restaurant and the vacant building that is next to the restaurant, with the front of her car facing the school. The "X" on Govt. Ex. 25 indicates where Ms. Ruffin parked. After picking up her nephew, Ms. Ruffin crossed the street and returned to her car. As she approached the driver's side of the car, she heard a gun shot that appeared to come from the direction of the bank. Ms. Ruffin looked in the direction of the shot and saw a man pointing a gun at a security guard. The guard appeared to be bent over. At this point the man and the guard were facing one another. The man was holding the gun straight out in front of him. A few seconds after the first shot, she saw and heard a second shot, and the guard fell over. Ms. Ruffin repeatedly stated that she was not good at estimating distances, but referencing the courtroom, she

estimated that the two men were the same distance from one another at the time of the second shot as the distance from the witness seat to the television then stationed in the courtroom.  The Court takes judicial notice that that was a distance of approximately five feet.  There were no obstructions blocking her view of the shooting.

After the second shot, Ms. Ruffin watched as the shooter ran through the parking lot, past a row of parked cars, toward the circle.  He then crossed Goodfellow, heading toward her.  He stopped on the sidewalk near the sign mounted on the pole that is reflected on Ex. 25.  Ms. Ruffin also saw a second man run from the area.  He was approximately 6' tall, with a dark complexion, and he was wearing black pants and a hood.  She saw the second man run across the street and into the circle, at which time she lost sight of him.  Ms. Ruffin had a clear view of the shooting and the shooter as he ran, and she had a clear view of the shooter when he crossed Goodfellow, stopped at the sign, and crossed to the front of the restaurant.  At this point the man was moving quickly, but not really running; he was jogging.  She no longer saw the gun as the shooter crossed the street and stopped by the sign.  By this time, Ms. Ruffin's nephew had gotten into the car, and Ms. Ruffin was standing next to her car with the door open.  She watched as the man ran along the front of the restaurant and toward the back.  At this point, she lost sight of him behind the restaurant building.

Ms. Ruffin told her nephew to stay down on the floor of the car, and she got into her car and drove toward the parking lot entrance.  When she reached the entrance, which is marked with a circle on Ex. 25, she looked toward the direction where she had seen the

shooter headed and saw him getting into a black two-door car.  The triangle on Ex. 25 shows the place where the shooter's car was parked.  She turned left onto the street, toward where the shooter's car was parked.  The shooter backed the car out of the space, drove through the lot in the opposite direction, and turned onto the circle.  Ms. Ruffin was able to see the car best when it pulled out of the parking spot.  Ms. Ruffin watched the car carefully and described it as an older model Celica, with no license plates, and with what appeared to be a temporary tag in the upper left corner of the rear window.  She was not able to read any numbers on the temporary tag.

Ms. Ruffin testified that her attention was fully focused on the man who shot the guard.  Although she was a little scared, she was aware of what was going on around her.  She did not go to the scene and did not see the guard after he was shot or any blood.  She made a conscious decision to try and look at the car and its characteristics so that she could help the police.

Ms. Ruffin drove home, arriving approximately five minutes after the incident.  She then had to go to the store for her mother.  When she returned home from the store, she immediately called 911 to advise them what she had seen.  After she had discussed what she had seen briefly, the phone call got cut off.  A police officer, perhaps Det. Pappas, called her back, and she gave the detective a description of the car.  She described it as a two-door black Celica, older model, with no plates, and temporary tags in the upper left window.  She did not know whether she described the shooter or his age during this phone call.

<u>Investigation at the Scene</u>

Det. Stone was called to the scene at approximately 3:31 p.m.  He was advised that a security guard had been shot.  Others, including Lt. Ronald Henderson and Detectives Carroll, Hanewinkel, Ballman, Adkins, Wasem, and Vannest also reported to the scene. It took Det. Stone approximately 20-25 minutes to arrive.  The 6th District Watch Commander, Lt. Indelicato, and other officers were already at the scene when Det. Stone arrived.

Officer Doug Eatherton, the evidence technician, was assessing the evidence.  He processed the parking lot, where certain items were seized, and nearby areas, where items, including clothing, were recovered.  There was a nylon skull cap and a blue and black head covering on the ground near where the victim had been shot, both of which were seized.

Det. Stone met with Lt. Indelicato and learned that the guard had been shot on the lot, that no suspects were in custody, and that witnesses were inside the bank.  He began to investigate the scene with Officer Eatherton, while Dets. Carroll, Hanewinkel, and Ballman began interviews of those in the bank.  As others got information, they generally would bring it to Det. Stone.  Dets. Stone and Carroll learned they were looking for multiple suspects and learned the general direction where the suspects had fled.  They understood that one was seen running toward the C & W and another was seen running across Halls Ferry Circle, in the grassy circle.  Possibly another had gone toward Sundown.  Det. Stone eventually learned that the individual who had fired the shots had

been described as a black male, in his early 20s.

Det. Chaney came on duty at 4:00 p.m. He and approximately four other officers were assigned to canvas the area. Det. Chaney went down Sundown and began a door-to-door canvas for witnesses, but did not find any useful information. He was then directed to the alley behind the old Jack-In-The-Box to look for a suspect on foot. In the meantime, the police learned of information regarding the vehicle, and Det. Chaney heard an all points bulletin (APB) giving a description of an older model, black Toyota Celica, with temporary tags in the window.

<u>Interview of the Defendant at 1157 Howell and Seizure of the Car</u>

Almost immediately after hearing the APB about the car, Det. Chaney saw a vehicle matching the description in the area he was canvassing. The car was parked on a parking pad in the backyard of 1157 Howell. Govt. Exs. 2 & 3. 1157 Howell is located approximately 1/4 -1/2 mile from the bank. There is a porch off the kitchen at the back of the house at 1157 Howell and a small yard. There is a cyclone fence on both sides of the house, but the back of the yard, which adjoins the alley, is not fenced and is totally open. There is a cement parking pad directly off the alley and a garage next to the parking pad.

The car was parked on the parking pad, facing the rear of the house. It was not running, and the windows were partly open. Det. Chaney had been walking along the alley when he spotted the car, and he approached the car from the unfenced alley at the back of the yard. He looked inside the car, from the outside and without touching it. He did not see anything inside the car. He alerted Dets. Pickett, Vannest, and Sweeney, who

were nearby and who joined him at the car, and also contacted his superiors.  It was approximately 5:10 p.m. and still light outside.

An individual, later identified as defendant Bolden, Sr., came out of the rear of the house and asked if there was a problem with his car.  Det. Chaney advised the defendant that they were conducting an investigation.  He did not give any directions to the defendant or attempt to inhibit his movements, and the officers did not have their weapons drawn.  The defendant asked the same question of Det. Vannest, who explained to the defendant that they were investigating an incident that had occurred in the area.  Det. Vannest asked the defendant if the car was his, and he said it was.  They asked if he had driven the car that day, and the defendant stated that he had not driven the car for a few days.  The officers did not have any further conversation with the defendant at that time, and no one entered the yard or walked up to the porch.  The officers did not draw their weapons at any time.

During this conversation, the defendant remained on the back porch, and the officers remained near the car at the parking pad.  The defendant was wearing white or beige painter's pants and a white T-shirt, and his hair was in a wavy Afro, with no head cover.   The defendant's demeanor was calm, and he did not appear to be concerned about the officers' presence.  Nothing about the defendant suggested that the defendant was under the influence of drugs or alcohol.

In the meantime, Dets. Stone and Carroll learned about Erica Ruffin's call to the police.  After they wrapped up their investigation at the scene, which took a total of

approximately 1½-2 hours to complete, they went to Ms. Ruffin's house and began to take her statement. She advised them that she had called 911 and described the problems she had encountered. She said she had witnessed the shooting and had observed the shooter run toward the C & W lot where she was parked. She described the vehicle the suspect had entered as an older model, black Toyota Celica, with temporary tags. Her demeanor appeared credible. After she described the car, but before she provided any details regarding the shooter's description, Dets. Stone and Carroll received a call that a car matching the description provided by Ms. Ruffin had been located. They advised Ms. Ruffin that they might have found the car and asked her to go with them to see if it was the car she had seen. The distance to the 1157 Howell address was only 1/4-1/2 mile from Ms. Ruffin's house, and it took only a few minutes to get to the defendant's house.

They drove to the alley behind 1157 Howell in an unmarked car, with Ms. Ruffin seated in the backseat. She advised the officers that she did not want to be seen. As they neared, the officers had her scoot down in the backseat, and she covered the side of her face with her hand. Before they reached the garage, the officers stopped the car, and Det. Stone got out to clear the area. From where they were, on the other side of the garage, they could not see either the Celica or the other officers. Det. Stone walked around the garage to where Det. Chaney and at least three other officers were, near the car. None of the officers were in uniform. The officers were wearing khaki pants and blue raid jackets that identified them as police, and Det. Stone was wearing a suit. Defendant Bolden, Sr., was on the back porch.

About the same time that Det. Stone got out of the car, a black male, later identified as the defendant's son, approached from the other side of the alley and walked directly toward the vehicle. He was approximately 17 years old, 5' 5"- 5' 7" in height. He was stopped by Det. Vannest. The officers asked him who he was, and he identified himself as Robert Bolden, Jr. In response to their question, he stated that his father owned the Celica. He was taken to the front of the garage, away from the alley. As this conversation took place, Det. Chaney moved to the porch and stood near the defendant. No physical contact was made with the defendant.

Det. Stone approached the defendant and asked if they could go inside so that Det. Stone could explain what was going on. He wanted to get Bolden, Sr., away from the backyard so that the witness could view the car without being seen. At this point Det. Stone was thinking that Bolden, Jr., might be involved. The defendant said it was okay to go inside, and they stepped inside the doorway to the kitchen. The only persons present were Det. Stone, the defendant, and Det. Chaney. At this point, the defendant was not under arrest. He was not placed in handcuffs, and the officers did not have their weapons drawn. No promises or threats were made, and no officers made any threatening gestures. The defendant did not appear to be under the influence of any controlled substances or alcohol. The defendant appeared to understand what was being said to him, his responses were appropriate, and his demeanor remained calm.

Inside the house, Det. Chaney and the defendant were seated at the kitchen table, with Det. Chaney facing the door and the defendant with his back to the door. Det. Stone

was standing to the side of the defendant.  Det. Stone advised the defendant that the car

had been identified in connection with an incident, and that a witness was going to look

at the car.  He asked that the defendant remain in the kitchen while this occurred, and he

agreed.  At this point the officers were interested in the car.  They considered that

Bolden, Jr., was a possible suspect, but did not consider Bolden, Sr., to be a suspect at the

time.  Det. Stone asked if the defendant owned the car, and he said yes.

After the defendant went inside and Det. Carroll was advised that the area was

clear, he drove up to the Celica and stopped.  He asked Ms. Ruffin if that was the car she

had seen, and she said it was.  The officers had attempted to assure that no one other than

police officers were present when Ms. Ruffin viewed the car, and she did not see anyone

in the yard other than police officers.  Govt. Exs. 2 & 3 depict the car that she saw.  After

she identified the car, the detectives pulled further up the alley and parked.  They

arranged for another officer, Dana Pickett, to take Ms. Ruffin to the station in an

unmarked car.  The officers outside advised Det. Stone that Ms. Ruffin had identified the

car.  At this point, Dets. Carroll and Stone had not completed their interview of Ms.

Ruffin and did not know that she had described the shooter as 35-40 years old.  The only

descriptions they were aware of described the individual as younger.

Det. Stone advised the defendant that the car had been identified as having been

involved in an incident.  He asked if he had been in the car that day, and the defendant

said he had been asleep most of the day and had not driven the car in two days.  He said

that at approximately 11:45 he had walked to the Shell station and back, for either food or

cigarettes.  When asked why the windows were down, he said it was to keep the heat out.  At some point the defendant asked what had happened, and Det. Stone said there had been a shooting earlier in the day.

He asked if the defendant's son lived with him, and the defendant said he did.  He advised the defendant that they were going to tow the car for processing, and that the defendant's son, Robert Bolden, Jr., was going to be taken to police headquarters for an interview.

Det. Stone asked the defendant if his son had a room in the house and was told that he did.  He asked if he could search the room for weapons, and the defendant consented.  No threats or promises were made to induce the defendant's agreement.  The defendant's demeanor had not changed from what it had been earlier in the conversation; he still remained calm.  The defendant showed Det. Stone his son's room, which was located adjacent to the kitchen, in the rear of the house.  The defendant stood in the doorway of the bedroom while the room was searched.  The officers did not locate anything.  They did not request to search the defendant's room or any other room of the house.  Det. Stone asked the defendant if he had a key to the car, and he said he did.  In response to Det. Stone's request, defendant Bolden, Sr., gave Det. Stone the keys to the car.  Dets. Chaney and Stone then left the house, and the defendant remained inside.  The conversation with the defendant lasted 5-10 minutes.

Det. Stone told Det. Chaney that the car was to be towed, and he gave Det. Chaney the key that the defendant had given him.  Det. Stone made the decision to tow

the vehicle based upon the information they had received from Ms. Ruffin indicating that the shooter had driven away in the vehicle. Their intent was to look for trace evidence, clothing, weapons, and other evidence in the car. Dets. Carroll and Stone then returned to police headquarters, where Robert Bolden, Jr., had been taken in a separate van. Defendant Bolden, Sr., remained at his residence.

After the other officers left, Det. Chaney waited by the car with Sergeant Fears for the tow truck to arrive, which took quite a while. After they had been waiting about 30-35 minutes, defendant Bolden, Sr., came out of the house and asked if it was okay to go and get cigarettes. Det. Chaney said no problem, and defendant Bolden, Sr., left the house. The defendant's demeanor was still calm.

In the meantime, Dets. Stone and Carroll went to police headquarters and interviewed the defendant's son. Robert Bolden, Jr., was advised that he was a suspect in a shooting, and that the vehicle had been identified. The description Det. Stone had heard of the shooter was that he was a young black male, in his early 20s, and slender. Robert Bolden, Jr., was advised of his rights, and he acknowledged that he understood his rights. He waived his rights and agreed to speak to the officers. The defendant's son advised the officers that he had been at school, and that he came home at approximately 3:00 p.m. to drop off some items. He then left to play video games at a friend's house and returned while the officers were there. At this point, the detectives determined that Robert Bolden, Jr., did not know what was going on, and they stopped interviewing him. They also confirmed that Bolden, Jr., had been at a friend's house at the time of the shooting.

At approximately 6-6:30 p.m., Ms. Ruffin arrived at the police station and was interviewed by Det. Pappas. During her interview, Ms. Ruffin provided a detailed description of the shooter. She recalled that she described him as a black male, approximately 5' 5"-5' 6" tall, and 35-40 years old. He had a light complexion and looked like he had not shaved in a few days. His hair was combed back, and he was wearing light blue jeans, a blue sweatshirt with a gold logo, and tennis shoes. Ms. Ruffin felt that she had gotten a good look at the shooter's face when he stopped in front of her near the sign. The police report reflects that Ms. Ruffin described the shooter as a black male; 35-40 years old; 5'6"-5'7" tall; 150-160 pounds; clean shaven, with a light complexion; brushed back hair; and wearing a medium blue sweatshirt with writing on it, and light colored jeans. (Govt. Ex. 22) To the extent that the police report states that she described the shooter as clean shaven, Ms. Ruffin said the police report was incorrect.

Det. Stone spoke to Det. Pappas, who had interviewed Ms. Ruffin. It was at this time that Det. Stone learned for the first time that Ms. Ruffin's description of the shooter was different from the description he understood other witnesses had provided at the scene, and that Ms. Ruffin had described the shooter as approximately 35-40 years old. Det. Stone determined that the description provided by Ms. Ruffin was consistent with that of the defendant, and that the direction in which she had seen him travel was also consistent with the direction the defendant would have traveled to his home. He and Det. Carroll determined that Robert Bolden, Jr., probably was not involved, but that defendant Bolden, Sr., might be involved.

They called Det. Chaney, who was still waiting for the tow truck, and advised him that their focus had changed; they now wished to speak with Robert Bolden, Sr., as soon as possible. This occurred approximately 15 minutes after defendant Bolden, Sr., had left the house. Det. Chaney told him that the defendant had left to get cigarettes.[5] He advised Det. Chaney that if the defendant returned, he was to be brought to headquarters. By this time it was approximately 6:30 p.m., and Det. Stone had had an opportunity to talk to Det. Carroll and others. He learned about the interviews of Jean Coser and Henry Wines, and their statements that the shooter had gone toward the C & W bolstered his opinion that Bolden, Sr., might be involved.

About 15 minutes after Det. Stone's call to Det. Chaney, some 30 minutes after he had left, defendant Bolden, Sr., returned to his house, walked past the officers, and went inside the house. Det. Chaney could see the defendant inside the kitchen. He knocked on the door and the defendant answered. Apparently at some point the defendant had discussed with the officers going downtown to pick up his son, and the officers asked him whether he was going to do that. The defendant said that he could not get a ride, and Det. Chaney offered to take the defendant downtown once the car was towed. The defendant advised them to knock on the door when they were ready and said he would be in the house.

Approximately five minutes later, the tow truck arrived. By this time, Officer

---

[5] To the extent the police report reflects that the defendant said he was leaving to get his son, Det. Chaney testified the report is incorrect.

Eatherton arrived at 1157 Howell to process the vehicle. He did not touch the car at the scene, but rather followed behind as the car was towed to the Laclede garage. Det. Chaney knocked on defendant's door, intending to drive him downtown, but there was no answer. They knocked on the front door, back door, and windows for almost five minutes, but there was no answer. Det. Chaney left with Sgt. Fears and had no further contact with the defendant thereafter.

Search of the Toyota Celica

At the garage, Officer Eatherton took photographs of the car. Govt. Exs. 2 & 3. He thereafter dusted the interior and exterior of the car for fingerprints, searched the car for evidence, and swabbed the steering wheel and gearshift for DNA evidence. He obtained two sets of fingerprints. Some documents related to the purchase of the car were found inside the glove compartment. He took pictures of the documents and returned them to where he had found them. He did not check for hair or fiber. He put evidence tape across the car and did not have any further contact with the car.

Interview of the Defendant at Police Headquarters

Sometime after the officers had advised the defendant's son that he was free to go, the officers asked him if his father would be coming to get him. The defendant's son said that his brother, Cordell Burnett, would likely drive his father to the station to get him. Bolden, Jr., advised Det. Stone how to reach Mr. Burnett on his cell phone. Det. Stone called Mr. Burnett, and Mr. Burnett advised him that he and the defendant were on their way to police headquarters. The officers then waited for Bolden, Sr., to arrive.

At approximately 8:30 p.m., defendant Bolden, Sr., arrived at the police station with Mr. Burnett. Det. Stone was advised of his arrival and met the defendant in the lobby. He asked Mr. Burnett if he minded waiting in the lobby and asked defendant Bolden, Sr., if he would mind coming upstairs to speak with him. Defendant Bolden agreed. The defendant was not advised that he was under arrest. Unbeknownst to Det. Stone, at this same time a second suspect, Corteze Edwards, was brought to headquarters. As the defendant and Det. Stone were getting into the elevator, Sgt. Johnson, from the 6th District, and Corteze Edwards got into the same elevator. At the time Det. Stone did not know who Corteze Edwards was or that he had any relation to the investigation. There was no conversation regarding the investigation in the elevator.

Det. Stone got off the elevator and took defendant Bolden, Sr., to an interview room. Det. Johnson and Corteze Edwards got off the elevator as well, but did not follow them. Det. Stone had the defendant sit in an interview room and advised him that he would be back. The defendant was not in handcuffs and was not restrained in any way. Prior to speaking with the defendant, Det. Stone went to speak with the other detectives in another interview room. They advised him that when Edwards saw defendant Bolden Sr., in the elevator, Edwards had made gestures regarding him and had indicated to the other officers that Bolden, Sr., was the shooter. The officers had deliberately not followed Det. Stone and the defendant in order to get Edwards away from him.

Det. Stone went back to the interview room where the defendant was sitting. Only 2-3 minutes had passed since Bolden, Sr., was first taken to the interview room. Det.

Stone handcuffed one of the defendant's hands to the table and got Det. Carroll so the two of them could conduct the interview.  The defendant did not appear to be under the influence of alcohol or controlled substances.  Nothing regarding his appearance or demeanor was different from before.  He appeared to understand what was being said to him, and his responses were appropriate.  The defendant was told that he was a suspect in a shooting.  At this point the defendant's demeanor changed.  At the house and when he first arrived, the defendant was calm; he now became angry.

The officers read the defendant his <u>Miranda</u> rights from a card that they had with them.  By this time the defendant had been in the room 5-6 minutes, and no questions had yet been asked of him.  The defendant was advised:

> You have the right to remain silent.  Anything you say can and will be used against you in court. You have the right to a lawyer and to have him with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you so desire.

The defendant was asked if he understood the rights read to him, and he said he did.  Officer Stone did not observe anything to indicate that the defendant did not understand his rights.  The defendant stated, "I didn't do a mother-fucking thing."  The officers asked him if he would waive his rights and agree to speak to the officers about the shooting that had taken place at the Bank of America earlier that day, and the defendant agreed.

Det. Carroll first asked the defendant if he would take a test for gunshot residue, but the defendant refused.  When asked why, the defendant said a few days earlier he had test-fired a .38 caliber handgun for a friend who was thinking of buying the gun.  He said

his friend was afraid to shoot and that he had test-fired the firearm for him inside the garage at 1157 Howell, toward the wall of the garage. At some point during the interview Det. Stone learned from other officers that while he was interviewing the defendant, Corteze Edwards was making a detailed statement implicating himself and identifying the defendant as the shooter. The defendant was asked whether he could account for his whereabouts, and he said he had been at home. He said he had left earlier to go to the Shell station and had then gone to the Chinese restaurant at the Halls Ferry Circle. When asked what time he had gone to the station and the restaurant, the defendant did not say. The defendant said he wanted to know who was snitching on him, and they responded that no one was snitching on him. Defendant Bolden, Sr., then said, "I ain't saying another mother-fucking thing I already told you." The detectives took this to mean that he was just going to keep saying the same thing; they did not take it to mean that he did not want to speak to them anymore. At this point the defendant continued to engage the officers in conversation. He asked where his son was and also asked other questions, trying to find out what the officers knew. He asked again where his son was and what was going to happen to him, and the officers advised him that his son would be released to Mr. Burnett. The defendant never said that he did not want to talk to the officers, never requested a lawyer, and did not at any point just stop talking.

During the interview, Det. Carroll requested a DNA sample from the defendant. They presented him with a Buccal Swab consent form. Govt. Ex. 5. Det. Carroll had the defendant read the form, and then Det. Carroll read the form to him. They crossed out

the portion on the form pertaining to blood samples. No threats or promises were made to the defendant in connection with the consent form, and Det. Stone saw no signs that the defendant was confused about their request. Either before or after he signed the form, the officers explained the process to the defendant, explaining that it was a cotton swab at the end of a toothbrush-type stick, and that the defendant would rub the inside of his mouth himself and then drop the swab into an envelope. The defendant signed the consent form. The defendant then swabbed the inside of his mouth with two sticks, generating two samples. Det. Carroll opened the envelope with gloves, and the defendant released each sample into the envelope. The detectives advised the defendant that they wanted to put him in a lineup, and the defendant responded, "Do what you got to do." The defendant refused to make a recorded video or audio statement.

The Lineup Identifications

By this time, Dets. Stone and Carroll knew that there had been three witnesses who observed the shooting, Ms. Coser and Mr. Wines on the bank lot, and Ms. Ruffin who was across the street. Other officers called the witnesses and asked them to come to the station, and Det. Stone met with each of the witnesses after they arrived. In the meantime, Det. Carroll proceeded to assemble other individuals for a lineup. It was their practice to obtain the other individuals, or foils, from the holdover cells. The detectives do not usually obtain individuals from other places because they would have to obtain a writ to obtain individuals who are already charged, which can take a lot of time, and because prisoner transportation creates safety issues. It was the detectives' practice to try

and assemble the lineup as soon as possible, both because they could only hold a suspect for 24 hours before they would need to charge him or release him, and because they wanted to conduct a lineup when the witnesses' memories were as fresh as possible. On that particular day, there were approximately 30-50 other individuals to choose from. Det. Carroll took the defendant with him and tried to select individuals who matched the defendant's height, weight, race, and sex. He was satisfied with the lineup he put together. Defendant Bolden, Sr., was wearing the same clothes he wore to the station.[6] He was advised of the opportunity to have a lawyer present at the lineup, and he stated he did not want a lawyer. It was their practice to permit the suspect to select his own position in the lineup, and defendant Bolden selected the #2 position. Det. Carroll stayed with the lineup, and Det. Stone remained with each of the witnesses. Det. Carroll was unsure whether the witnesses could possibly see him from outside the room, but he did not do anything suggestive during the identification process.

After the lineup was assembled, Det. Stone took Ms. Ruffin to view the lineup first. Although Mr. Wines had also arrived at headquarters by this time, the two witnesses were kept in separate rooms. Det. Stone brought each of them to the second floor, but did not permit any interaction. While Ms. Ruffin went to view the lineup, Mr. Wines remained in an interview room.

Ms. Ruffin testified that approximately two hours after she arrived at the station

---

[6] The shirt the defendant wore to headquarters was different than the one he was wearing when the detectives first spoke to him at his home.

the officers had asked her if she would view a lineup, and she agreed. At approximately 9:15 p.m., Det. Stone took her to a small room with a glass window she could look through. Although Ms. Ruffin could not recall exactly what Det. Stone said to her, she recalled he asked her to look carefully and take her time, and if she saw the man from the incident in the lineup to give them the man's number. Det. Stone recalled advising her that he wanted her to view a lineup in connection with her earlier statement, and if she recognized anyone to let him know. He did not affirmatively advise her that it was okay not to make an identification or advise her that the individual might not be there. She did not discuss the incident with any other witnesses either before the lineup or after. In describing her state of mind at the time of the lineup, she said she was doing well and that she knew that this was a serious and significant matter. Govt. Ex. 7 reflects the lineup viewed by Ms. Ruffin and Mr. Wines. She looked at all of the men carefully and told the detective that the man she had seen was the second one, identifying the defendant, Bolden, Sr. She did not look at the detective at all during the time prior to making the identification, and the detective did not suggest to her in any way who to pick. Ms. Ruffin felt 100% sure of her identification at the time. Ms. Ruffin stayed at the station for approximately 30 minutes to one hour after the lineup, but she did not discuss the events with the officers during this time period.

Mr. Wines recalled that he had received a telephone call from the police asking him to go to police headquarters to view a lineup at approximately 8:30 p.m. that night. He thought the officer said they had made an arrest. He drove to headquarters by himself

and waited for a detective to come and get him. He was taken to a room to view the lineup. Prior to getting to the room, Det. Stone did not say anything to him, and Mr. Wines did not see or talk to any other witnesses prior to viewing the lineup. They went through a door, and Det. Stone told him they were going to the lineup. He went to a door that had a window through which he could see the lineup. Govt. Ex. 7. Det. Stone asked him if he could identify anyone from the lineup. Det. Stone did not recall using the word "suspects"[7] in his directions to Mr. Wines or Ms. Ruffin. Mr. Wines looked at the lineup carefully, for 2-3 minutes. He did not really look at any of the other men, because he could immediately identify the man he had seen shoot the bank guard and zeroed in on him. He saw some differences from how the man had looked at the bank. His hair was not braided and his clothing was different, but the clothing made no difference to him. He focused on the man's face and eyes and was certain that he was the man he had seen at the bank. He identified #2, who was the defendant, as the person he had seen in the shooting at the bank. Prior to identifying the defendant, Mr. Wines did not look at the detective, and the detective did not do or say anything to suggest which individual Mr. Wines should pick. Mr. Wines understood the significance of what he was doing and took it seriously. He advised Det. Stone he was positive about the identification. Det. Stone did not ask Mr. Wines about the difference in age between the defendant and the

---

[7] The defendant has argued, based on one portion of the testimony, that Det. Stone told the witnesses to view each of the "suspects" and tell him if they recognized anyone. Based on the whole of Det. Stone's testimony, the Court finds little to suggest Det. Stone used the word "suspects" in describing the lineup.

description he had given to the police. Det. Stone thanked him for coming in, and Mr. Wines left.

Prior to his testimony at the hearing, Mr. Wines had never seen a photograph of the lineup that he viewed. He was shown Govt. Ex. 7 and identified it as the lineup he had viewed. Sometime after the incident, Mr. Wines met with AUSAs Holtshauser and Riley at the bank, mostly discussing the physical layout. He met with them again the week prior to his hearing testimony.

Ms. Coser was the last witness to view the lineup. She had received a telephone call from the police at approximately 8:30 p.m. that evening, asking her to come down and view a lineup. She was told they had "somebody there." Her husband drove her to police headquarters downtown. They arrived from Warrenton at approximately 9:45-10:00 p.m. After she arrived, a detective came and got her and said he would be taking her to the 2nd or 4th floor. He brought her to a sitting area. No one other than Ms. Coser, her husband, and the detective were in the room. The detective said that they had someone they thought was involved and asked if she would view the lineup and see if that was the person involved. At approximately 10:05 p.m., Det. Stone brought Ms. Coser to view the lineup. Govt. Ex. 8. He told her to let him know if she recognized anyone. She saw four men in the lineup. The composition of the lineup was slightly different from that viewed by the other two witnesses. See Govt. Exs. 8 & 9. This time the defendant was in the third position, and Det. Stone assumed Det. Carroll had permitted him to select this position. Ms. Coser immediately saw the man she had seen shoot the guard and

identified the defendant, #3, as the man she had seen shoot the guard.  She testified that she did not really compare him to the other three persons, as she believed she immediately recognized the man she had seen.  She did not really notice what clothing they were wearing.  She did not see or speak to any other witnesses either before or after the lineup and did not know who the other witnesses were.  She was brought back to the waiting area.  At that time a detective advised her that she was not the only one who picked out the same individual, and that another man had said he was the one who shot the guard.   After the incident, Ms. Coser thought she had seen some newspaper or news accounts of the incident, but she said she did not go out of her way to buy a newspaper to see if anything was there regarding the incident.

Three men were charged:  Robert Bolden, Sr., Dominick Price, and Corteze Edwards.  Defendant Bolden, Sr., was advised that he was under arrest for murder.  On the booking sheets, defendant Bolden, Sr., is described as 39 years old, 130 pounds, and 5'4" in height.  Dominick Price was described as 18 years old, 170 pounds, and 5'7" in height; and Corteze Edwards was described as 19 years old, 155 pounds, and 5'7" in height.  The defendant was not further interviewed immediately following the lineup, and he did not make any further statements that night.

October 8, 2002 Consent to Search the Residence

On October 8, 2002, Det. Hanewinkel contacted defendant Bolden, Sr., for the purpose of requesting consent to search his home.  Det. Hanewinkel was aware at the time that the defendant had waived his rights under Miranda the day before.  The

defendant was brought to an interview room at approximately 12:30 p.m. The defendant's handcuffs were removed while the discussion took place. The only individuals in the room were the defendant, Det. Hanewinkel, and Det. Vannest. The defendant and Det. Hanewinkel were both seated. Det. Hanewinkel read the defendant his rights from a card that he keeps with him, as follows:

> You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to a lawyer and to have him with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you so desire.

He asked the defendant if he understood his rights, and the defendant said that he did. He then asked the defendant if he was willing to waive his rights, and the defendant said that would be fine. The defendant appeared to be alert and cognizant of what was going on. He did not appear to be under the influence of alcohol or narcotics and did not appear to be suffering from any physical problems. The defendant asked if they had anything to eat. He did not appear to have any health problems and did not suggest that his desire to get something to eat was linked to any health problem. The detectives agreed they would get him some food. Under the procedures at the holdover, the defendant should have already had breakfast and lunch prior to the interview.

Det. Hanewinkel advised the defendant that they had brought him back to the station because they wanted his permission to search his home, and that they were looking for a weapon. The detectives showed the defendant a blank consent-to-search form. After confirming that the defendant could read English, they let him review the

form.  The detectives filled in the blanks in front of the defendant, and they explained the form to the defendant.  They advised him that they wanted to search the whole house, yard, and garage.  Det. Hanewinkel testified that he would have advised him that he did not have to consent.  He did not advise the defendant that they would get a search warrant if he declined.  The defendant signed the consent form.  Govt. Ex. 10.  He did not ask any questions.  The only concern the defendant raised was that he did not want any damage done to the door.  Det. Hanewinkel asked the defendant if they could get his house keys from his property bag, and the defendant apparently agreed.

The detectives left the room to obtain the defendant's property bag.  They returned with the property bag and opened it in the defendant's presence.  The defendant identified which key was the key to the house.  At some point after the consent was signed, they got the defendant some food, and he was left to eat the food while the search was conducted.

Dets. Hanewinkel, Vannest, and Carroll and other officers went to the defendant's house and entered through the front door, using the defendant's key.  The residence is a single-family home with a small yard and a detached garage at the end of an alley.  Govt. Ex. 14a.  The house was unkempt or messy, but it did not look like it had been ransacked. They searched the house and in the bedroom located a partial box of .22 ammunition and a utility bill addressed to the defendant at that address.  The officers did not seize anything else.  Det. Carroll inspected the garage and did not see any holes in the wall from a firearm.  One or more officers searched the yard, but did not locate anything.  The officers secured the residence and then returned to the station.  The search took

approximately one hour.

When they returned to the station, the detectives advised the defendant what they had seized. This occurred sometime prior to 2:00 p.m. After they advised the defendant of the ammunition seized, he stated that he used to own a .22 rifle. The detectives did not further interview the defendant following the search. They put the defendant's keys and the rest of his property into a new evidence bag and sealed the bag in front of the defendant. Defendant Bolden, Sr., was then returned to the holdover.

<u>Facts Related to Defendant's Lease and Eviction from 1157 Howell</u>

Prior to the shooting, the defendant had been a lessee of the property at 1157 Howell, which was owned by Beverly Granberry. Ms. Granberry, who owns a funeral home, first met the defendant in approximately March 2001, when he contacted her with regard to arranging the funeral of his mother. After learning that he was employed as a carpenter apprentice and had nowhere to live, Ms. Granberry offered to let him stay at 1157 Howell, which was in need of some repair. He moved in in August 2001, and Ms. Granberry told him that for the period from August to November he could perform repairs to the property in lieu of rent. On November 1, 2001, Ms. Granberry entered into a written six-month lease with the defendant, with a rent of $350/month. Govt. Ex. 15. No security deposit was required. In November the defendant paid the rent. In December he came with the full rent, but asked if he could borrow a portion back for Christmas presents, and she agreed.

Thereafter, Ms. Granberry began to have problems getting the rent from the defendant. She also had problems contacting him, as the phone was disconnected. She left messages for him at his work, and the calls would be returned a few days later. In January and February defendant only paid a portion of the rent. In March he paid nothing, and Ms. Granberry was unable to contact him. She got no response when she went by the house, and he no longer returned messages she left at his work. She was able to see him at the house one time, and he said he had been ill and unable to work and promised to pay the rent. She advised him he would be evicted otherwise. Defendant Bolden, Sr., did not make any payments, however.

In May 2002, Ms. Granberry attempted to deliver a letter to the defendant demanding full payment and advising that absent payment, he would be evicted. Govt. Ex. 16. She attempted to deliver the letter three times, but each time it was returned undeliverable. Govt. Ex. 16A. Messages she left at defendant's place of employment were not returned, though she was advised the defendant still worked there. At some point during the few weeks prior to the shooting, Ms. Granberry's handyman, Mr. Nicks, stopped by the house to try and speak with the defendant. He advised the defendant that he needed to try and work with Ms. Granberry or she would evict him. The defendant, however, did not make any rent payments.

After the shooting Ms. Granberry learned of the defendant's arrest. Sometime thereafter she went by the residence. She became concerned and wanted to get into the premises as soon as possible, because she observed signs of vandalism. The windows

were broken, the gutters had been pulled down, the garage door had been torn down, some of the cyclone fence was missing, and an air conditioner was starting to come loose.

Ms. Granberry began the process to have the defendant evicted. She had initiated some eviction proceedings previously, regarding other tenants, but attorneys had always handled the proceedings for her in the past. This time she handled the process herself because she lacked the funds for an attorney; it was the first eviction she handled without counsel. She obtained instructions on the process from the court clerk and went to the courthouse and completed the necessary paperwork. Govt. Ex. 17 is a copy of the affidavit submitted to the court on October 25, 2002. She advised the Clerk's Office and the Sheriff's Office that the tenant had been arrested. On November 22, 2002, Ms. Granberry had a hearing at which she advised the judge of the facts, including the defendant's arrest. Judge Quigless entered a judgment for possession of the premises. The judgment provides a notification of 10 days from the date of the judgment to file a motion to set aside the judgment. It further states that "Failure of Defendant to set aside this judgment or file trial de novo, within TEN days, will result in this judgment becoming final and Defendant will be subject to eviction from the said premises without further notice." Govt. Ex. 18. Based upon her discussions with the judge, Ms. Granberry understood that she had to wait ten days before she could dispossess the defendant from the premises, and she believed that after ten days she was entitled to possession. She did not return to or file any paperwork with the writs department or the Sheriff's Office following the hearing, but she did not believe that was necessary. She had not previously

had to dispossess any tenant, as the previous evictions with which she had been involved had always been resolved by settlement or the tenant leaving. She thought that the Sheriff's Office had contacted her after the ten-day period expired. She also believed the FBI office was aware of the eviction process as it was occurring.

Ms. Granberry waited more than the required ten days and then entered the premises at 1157 Howell and took possession. When she entered the house, she saw that the property had been totally vandalized. The light fixtures had been stolen, the carpeting had been pulled up, and the stove and refrigerator were gone. There was trash and debris everywhere. Although clothing remained in the house, it was on the floor and in trash bags and was not hanging in the closet. She did not take anything from the house at that time. Sometime after December 15, 2002, Ms. Granberry had the locks changed, but she could not recall whether this occurred before or after her meeting with Special Agent McGinnis in January 2003, described below.

<u>January 16, 2003 Search of the Residence</u>

On January 16, 2003, Special Agent (SA) Terry McGinnis attended a proffer by co-defendant Price. Dets. Stone and Carroll and counsel for the government and Price were also present. Price advised them that the weapon used in the shooting was in the backyard of defendant's residence at Howell. He said the gun was on the ground under the guttering, to the left rear side of the house. Price advised them that defendant Bolden, Sr., had put the gun there and had advised Price of its location. He claimed to have firsthand knowledge that the gun was there.

-41-

SA McGinnis left the proffer and drove to the rear of the house to see if the gun was still there. He was concerned about public safety, as the home was located in a residential area where children were present. He did not have or seek a search warrant and did not speak with the landlord prior to going to the residence. At the time SA McGinnis believed that the property was vacant, and he knew that the defendant had previously provided consent to search and that the premises had previously been searched. SA McGinnis had also been to the residence a few weeks before to view the area and determine if anyone was home for interview purposes. He had spoken to a neighbor who indicated that no one was living at the residence anymore. He knocked on the door of the residence, but there was no answer, and he saw no signs that anyone was living at the house during this earlier visit.

When he returned to the property immediately following the proffer on January 16, 2003, SA McGinnis entered the backyard through the open area accessible from the back alley. He saw that the garage was open, with no door attached to it. He turned over some trash in the yard and then proceeded to the left rear side, where guttering was in the yard, near the side fence. He saw a white plastic bag peeking out from the guttering. Govt. Exs. 14b & 14c. After photographing the scene, SA McGinnis removed a piece of the guttering and removed the bag. He opened the bag and found a handgun with white grips. The firearm was loaded. It holds nine .22 caliber rounds; six[8] live rounds were in the

---

[8] The witness said the firearm held nine rounds and that nine rounds were in the chamber and three were spent, but the Court assumes this was a misstatement.

firearm and three rounds were spent. He seized the bag and the firearm and preserved the evidence for the lab. He did not conduct any further search of the yard or the house.

### January 22, 2003 Consent Search

SA McGinnis testified that following the proffer he intended to get a search warrant to conduct a more thorough search, regardless of what he might find in the yard. On January 21, 2003, he interviewed the defendant's landlord at the funeral home that she owned. She confirmed that she owned the property at 1157 Howell. Ms. Granberry advised SA McGinnis of her history with the defendant. She advised him that she had been trying to help Bolden, Sr., out and had rented the home to him, but that she never got any rent, except perhaps one time. She advised the agent that her handyman had visited the defendant on October 6, 2002, to try and get the defendant to leave the premises, but the handyman's efforts were unsuccessful. She also advised SA McGinnis that she had gone to civil court and obtained an eviction order. Govt. Ex. 11 is a copy of the Judgment obtained on November 22, 2002. She stated that the eviction was complete, that she had since lawfully retaken possession, and that she was working with the insurance company and trying to make arrangements to fix up the property so that it could be re-rented. She confirmed that she had keys to the residence. SA McGinnis did not advise her that he had recently located a firearm at the residence.

Ms. Granberry voluntarily agreed to permit the search and signed a Consent to Search form, permitting a "complete search" of the premises at 1157 Howell. Govt. Ex. 12. No threats or promises were made to induce her to sign the form. Ms. Granberry's

only condition was that her handyman be there to open the door, and she arranged to have her handyman meet the agents the next day. Ms. Granberry did not know that the firearm had been found in the yard prior to giving her consent. Had she not provided consent, SA McGinnis intended to seek a search warrant.

On January 22, 2003, SA McGinnis and others went to the residence, took photographs, and conducted a thorough search. Inside there was clothing and some furniture, but it looked as though the house had been ransacked or burglarized. Nothing new was seized from inside the house. They searched the walls of the garage, but did not find any bullet holes.

## CONCLUSIONS OF LAW

### 1. Identification of the Car and Discussions with Defendant at 1157 Howell

The defendant does not specifically challenge the initial encounter with law enforcement personnel on October 7, 2002. On these facts, though, neither the officers' identification of the car nor their questioning of the defendant implicated defendant's constitutional rights.

Here, the officers did not initially enter the defendant's home; they merely walked onto the parking pad, which opened to the public alley, and looked at the car. As the defendant acknowledged in his reply brief, in Singer the Eighth Circuit found that there is a reduced expectation of privacy in driveways and walkways. United States v. Singer, 687 F.2d 1135, 1144 & n.17 (8th Cir. 1982). See also United States v. Reyes, 283 F.3d 446, 466 (2d Cir. 2002) (no Fourth Amendment violation when officer entered on driveway

-44-

across which chain stretched to prevent vehicle access, but no signs forbidding pedestrian access). Based on the testimony, the parking pad at 1157 Howell is fairly equivalent to a driveway. As such, the officers' actions in walking onto the parking pad and doing a visual inspection from outside the car did not violate defendant's rights.

The officers' discussion with the defendant outside the home was initiated by the defendant and was a consensual encounter. No Fourth Amendment interest is implicated when officers approach an individual on the street and attempt to speak to him. Florida v. Bostick, 501 U.S. 429, 434 (1991); Florida v. Royer, 460 U.S. 491, 497 (1983); United States v. Dupree, 202 F.3d 1046, 1049 (8th Cir. 2000). "A Fourth Amendment 'seizure' does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen." United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001). Such encounters do not require any degree of suspicion. Bostick, 501 U.S. at 435; Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). Nor did the encounter escalate beyond a consensual encounter when the officers approached the defendant on the back porch or asked the defendant if he would step inside. United States v. Hammett, 236 F.3d 1054, 1059 (9th Cir.), cert. denied, 534 U.S. 866 (2001) ("Law enforcement officers may encroach upon the curtilage of a home for the purposes of asking questions of the occupants."); United States v. White, 81 F.3d 775, 779 (8th Cir.), cert. denied, 519 U.S. 1011 (1996); United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984). The determination of whether an encounter is consensual turns on whether the questioning is so "intimidating, threatening, or coercive that a reasonable person would not have believed

himself free to leave." United States v. McKines, 933 F.2d 1412, 1419 (8th Cir.)(en banc), cert. denied, 502 U.S. 985 (1991). Factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." White, 81 F.3d at 779 (citations omitted). Here, although several officers were present, they never drew their firearms, there was no physical touching, and nothing was said by the officers indicating that the request to go inside and discuss matters related to the car was compelled.

Defendant's statements to the officers inside the house were also the product of a consensual encounter. Again, the officers did no more than request to go inside. There was no show of force and no physical touching, and nothing to indicate the request was compelled.

Even if the officers' actions rose to the level of an investigatory detention, police officers may briefly stop a person for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). A Terry stop is justified on personal observations by the police officers or upon information the police officers have obtained through other sources, as long as the information is specific. White v. United States, 448 F.2d 250, 251 (8th Cir. 1971) (citing Terry, 392 U.S. at 21 n.18). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion

that a crime [is] being committed.'"  <u>United States v. Beck</u>, 140 F.3d 1129, 1136 (8th Cir.

1998) (quoting <u>United States v. Martin</u>, 706 F.2d 263, 265 (8th Cir. 1983); <u>see also</u> <u>United</u>

<u>States v. Arvizu</u>, 534 U.S. 266, 273-4 (2002).

On these facts, the officers had the requisite reasonable suspicion for a <u>Terry</u> stop.

The car matched the description of the shooter's car provided by Ms. Ruffin, and the

location of the defendant's house was consistent with the direction in which the shooter

had driven.  During the course of their conversation, Ms. Ruffin positively identified the

car as the one she had seen.

### 2.  <u>Search of Bolden, Jr.'s Bedroom</u>

The defendant has not specifically challenged the search of Bolden, Jr.'s bedroom,

and it appears that the officers did not seize anything as a result of that search.  Even if the

defendant had challenged the search, however, the Court finds that defendant freely

consented to the search during a consensual encounter.  <u>White</u>, 81 F.3d at 779.  Even if

one assumes the encounter had escalated to a <u>Terry</u> stop, the defendant was not in custody

and voluntarily consented to the search.  <u>United States v. Alcantar</u>, 271 F.3d 731, 737 (8th

Cir. 2001); <u>United States v. Hampton</u>, 260 F.3d 832, 835 (8th Cir. 2001).

### 3.  <u>Seizure and Search of the Celica Automobile</u>

Defendant has not challenged the seizure of the Celica, but it is likewise clear on

these facts that the seizure of the car was permissible.  Det. Stone advised the defendant

that the Celica would need to be towed and requested the keys from the defendant.  Just as

the request to search is permissible during a consensual encounter, see United States v. White, 81 F.3d at 779, the officer was entitled to request to see the keys.  Having heard the testimony and observed the demeanor of the witnesses, the undersigned finds the request to see the keys was not a demand, but rather was more akin to a request.  As such, the turnover of the keys was consensual regardless of whether the encounter was a Terry stop or a consensual encounter.  United States v. Pennington, 287 F.3d 739, 747 (8th Cir. 2002) (finding voluntary consent where officer had co-defendant throw him a Crown Royal bag sitting on a table during search, and he complied; dissent also finds voluntary compliance though describing request as "order"); United States v. Dupree, 202 F.3d 1046, 1049-50 (8th Cir. 2000).

In any event, by the time the officers requested the keys and arranged to have the car towed, the officers had probable cause to seize the automobile.  Ms. Ruffin had positively identified the car as the one she had seen the shooter use, its location was consistent with the direction in which the shooter had traveled, and the defendant's son somewhat matched the description of the shooter provided by some of the eyewitnesses.

Police may search an automobile or other vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or evidence.  Chambers v. Maroney, 399 U.S. 42, 52 (1970); Carroll v. United States, 267 U.S. 132, 162 (1925). The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts."  United States v.

Chadwick, 433 U.S. 1, 12 (1977). This distinction is based upon the mobility of automobiles and a diminished expectation of privacy associated with the automobile. United States v. Alden, 576 F.2d 772, 775 (8th Cir.), cert. denied, 439 U.S. 855 (1978). In such circumstances, the officers may search the entire automobile, including the trunk area, and any items or containers found in the automobile. United States v. Ross, 456 U.S. 798, 823-825 (1982).

**4. Statements Made at Police Headquarters on October 7, 2004**

When the defendant arrived at police headquarters, Det. Stone asked if he would mind coming upstairs to talk to him, and the defendant agreed. By this time Dets. Stone and Carroll had learned of Ms. Ruffin's description, and the focus of the investigation had changed toward the defendant as a suspect. At this point, however, the defendant was not under arrest and his agreement to accompany Det. Stone to an interview room was a voluntary and consensual one. A consensual encounter does not become a Terry stop merely because the defendant is considered to be a suspect. See United States v. Woods, 213 F.3d 1021, 1023 (8th Cir. 2000), citing United States v. Guerrero-Hernandez, 95 F.3d 983, 986 (10th Cir. 1996) (consensual encounter does not become custodial simply because individual being questioned is the target of an investigation).

After Det. Stone learned that Mr. Edwards had identified the defendant as the shooter, the defendant was handcuffed to the table, and he was advised that he was a suspect and advised of his rights under Miranda. At this point, the defendant was plainly in custody. Defendant seeks to suppress all of the statements made by the defendant after

he was placed in custody.  Based on the totality of the evidence, however, the Court finds that the defendant's statements to the officers in the interview room that night were voluntary and should not be suppressed.

A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connally, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  Moran v. Turbine, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Colorado v. Connally, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare."  Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).  See

<u>Dickerson</u>, 530 U.S. at 444.

Prior to making his oral statements, the defendant was advised orally of his <u>Miranda</u> rights. The defendant is an adult, and he appeared to be in a normal mental state and did not appear to be intoxicated or under the influence of narcotics. Although he was under arrest at the time he agreed to waive his rights and was handcuffed, there is no evidence of any threats, promises, or intimidation. Moreover, defendant had several prior criminal convictions and was therefore familiar with the criminal justice system. Govt. Exs. 13 a-c. Based on these facts, the Court finds that defendant's oral statements were voluntary and should not be suppressed.

Defendant contends that his statements must be suppressed because once he refused to submit to a gunshot residue test all further questioning should have ceased. Defendant also asserts that his later statement, that he was not going to say another thing he already told the detectives, constituted a further exercise of his right to remain silent, mandating the cessation of any interrogation.

If a defendant invokes the right to remain silent during questioning, the police must cease all questioning. <u>Michigan v. Mosley</u>, 423 U.S. 96, 103-4 (1975); <u>Miranda</u>, 384 U.S. 473-74; <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1131 (8th Cir. 2001). However, once a defendant has waived his <u>Miranda</u> rights, the invocation of the right to remain silent must be clear; if it is ambiguous or equivocal, further questioning is permitted. <u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994); <u>Simmons</u>, 235 F.3d at 1131; <u>United States v. Al-Muqsit</u>, 191 F.3d 928, 936 (8th Cir. 1999). The test for whether the defendant has

unambiguously invoked his rights is an objective one, based on defendant's statements as a whole.  Id.

Defendant's initial refusal to submit to a gunshot residue test did not constitute an unambiguous invocation of his right to remain silent.  That the defendant did not want to submit to a particular test in no way indicates a desire on his part to remain silent and refuse to answer further questions.  Fare v. Michael C., 442 U.S. 727, 727 (1979) (defendant's statement that he "could not, or would not, answer the question" not considered an assertion of the right to remain silent).  See also Connecticut v. Barrett, 479 U.S. 523, 529 (1987) (request to see attorney before making written statement did not preclude oral questioning by police absent an additional invocation of right to remain silent); United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (request for attorney prior to taking a polygraph exam did not preclude further questioning by police).  As such, defendant's statement regarding why he did not wish to take the residue test, as well as the statements that followed thereafter regarding his whereabouts that day and questions about who was snitching on him, should not be suppressed.

Defendant's next statement, "I ain't saying another mother-fucking thing I already told you," is less equivocal.  It is still a somewhat ambiguous and unclear statement, however, and the officers' interpretation of the statement as an indication that the defendant was going to keep saying the same thing is not unreasonable.  Moreover, immediately after the statement was made, it was not the officers who continued to question the defendant, but rather, the defendant who continued to speak to the officers.

He asked where his son was and began to probe the officers to find out what they knew. The ambiguity of defendant's statement, when coupled with defendant's conduct of continuing to initiate conversation with the officers, leads the Court to conclude that the defendant did not unequivocally invoke his right to remain silent. As such, any further statements made by the defendant during the course of the interview should not be suppressed.

### 5. **Consent to Provide DNA Sample**

Toward the end of the interview at police headquarters on October 7, 2002, the defendant was asked for consent to provide a DNA or buccal sample, and defendant agreed. Defendant does not specifically seek suppression of the buccal sample or raise any grounds for such suppression in his post-hearing briefs, and on this record, no grounds for suppression exist. As set forth above, the defendant was advised of his <u>Miranda</u> rights at the start of the interview, and he waived his rights. The detectives requested separate consent, both orally and in writing, for the buccal sample. The written consent signed by the defendant expressly states:

> "I, Robert Bolden willingly consent that a . . . buccal sample be taken for comparison testing by the St. Louis Metropolitan Police Laboratory. No threats or promises have been made, and I have been told that the results of these tests may be presented as evidence in a court of law."

Consistent with his voluntary consent, defendant swabbed his own mouth and placed the samples in the evidence envelopes himself. On this record, the Court finds that the defendant's consent was voluntarily given and the DNA sample should not be suppressed.

## 6.  **Lineup Identifications**

Defendant has filed a motion to suppress the lineup identifications made by Ms. Coser, Mr. Wines, and Ms. Ruffin.  A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparably mistaken identification.  Stovall v. Denno, 388 U.S. 293, 302 (1967).  Because it is the likelihood of misidentification that violates the right to due process, the court's inquiry focuses on the reliability of the identification.  Neil v. Biggers, 409 U.S. 188, 198 (1972).

Any analysis of identification testimony involves a two-step approach.  First, the court must examine whether the identification procedures used were unduly suggestive. Biggers, 409 U.S. at 198-99.  Second, if the procedures used were unduly suggestive, the court must then look to the totality of the circumstances to determine whether the identification testimony is nevertheless reliable.  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  In determining whether the identification is reliable, the court may look to such factors as the witness's opportunity to view the defendant, the witness's degree of attention, the accuracy of any prior description given by the witness, the witness's level of certainty in his or her identification, and the length of time between the occurrence described and the confrontation.  Id. at 115; United States v. Johnson, 56 F.3d 947, 953-4 (8th Cir. 1995).  The identification testimony may be admitted if the reliability of the identification judged by the above factors outweighs the effect of any undue suggestion. Id.  Each case must be reviewed on its own facts.  See Brathwaite, 432 U.S. at 114.

In this instance, the defendant has not shown the lineup procedures to be unduly suggestive. This is not like cases where the witness was shown only a single individual or a single photograph. Here the officers assembled lineups and for the distractors, or foils, attempted to select other individuals who fairly matched the defendant in appearance.[9] In this regard, the Court believes the officers where fairly successful. For each of the lineups they selected other individuals whose height, skin color, complexion, facial hair, and build were similar to defendant's. Granted, the foils each differed from the defendant in some respects, but that is to be expected with an in-person lineup, as opposed to a photo spread where officers may have hundreds of photographs from which to choose. Although one of the individuals in each of the lineups was a few inches taller than the defendant,[10] the other two were very close in height to the defendant. See United States v. Traeger, 289 F.3d 461, 474 (7th Cir.), cert. denied, 537 U.S. 1020 (2002) (lineup not impermissibly suggestive though suspect larger than other participants because size differential not too

---

[9] While at some places the defendant criticizes the lineups because the other individuals did not match the defendant, elsewhere defendant criticizes the lineups because they did not match the descriptions given by the witnesses. Where, as here, the witness descriptions vary somewhat from the defendant and from one another, the defendant cannot have it both ways. The Guide relied upon by defendant in his brief and discussed below, Eyewitness Evidence: A Guide for Law Enforcement, recommends that when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features. Guide at 30 - 31. It further recommends against using "fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers." Id.

[10] In other pleadings filed with the Court, the defendant has suggested that the foils should not match the defendant, but rather, should match the description. If these are in fact the qualities of a good lineup, the taller foil would have matched the description provided by Ms. Ruffin.

great; authorities "are not required to search for identical twins in age, height, weight, or facial features"). As defendant notes in his brief, the defendant's hair length is longer than that of the other foils and his clothing does stand out more than the clothing of the others, in that his shirt is very busy and he is wearing white pants, while the others are wearing dark pants. But these differences are not sufficient to make the lineups themselves unduly suggestive. While the defendant's clothing was different from that of the other foils, his shirt was quite different from what the shooter was wearing at the time of the incident. In addition, the witnesses credibly testified that they paid no attention to the clothing. See Harker v. Maryland, 800 F.2d 437, 444 (4th Cir. 1986) (photo array not impermissibly suggestive where only one other individual wore clothing similar to defendant's clothing, as identification based more on facial features than clothing). Overall, the Court finds the composition of the two lineups to be fair and reasonable. See United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995) (photo spread comprised of African-American men with similar features to the African-American suspect was proper).

The detectives also employed other procedures designed to minimize any unfair influences. Prior to the lineups the witnesses were kept separate from one another and no witness discussed his or her identification with any other. Nor did any of the witnesses see the defendant between the time of the incident and the lineup. Although the defendant was present when Ms. Ruffin went to identify the car, the officers took steps to assure that the defendant and Ms. Ruffin did not see one another, and the Court finds that Ms. Ruffin in fact did not see the defendant when she went to identify the car. The defendant was

permitted to select his own position in the lineup, and neither the detective with the lineups nor the detective with the witnesses did anything to suggest the selection of one individual over another.

Defendant asserts that comments made to the witnesses prior to and during the lineup put pressure on the witnesses to select someone. Specifically, defendant objects to Det. Stone's use of the word "suspects" when referencing the persons in the lineup; the advice to Ms. Coser when she was first contacted that they had someone they thought might be involved; and the fact that the witnesses were not expressly advised that they did not have to recognize anyone and might find no one from the incident in the lineup. Defendant argues the procedures were unduly suggestive because of these actions, coupled with the fact that each of the two lineups was small, consisting of only four persons.

The undersigned does not agree that any comments made by the detectives made the lineup procedures put pressure on the witnesses. When first contacted to view the lineup, it appears that Ms. Coser was advised that they had "somebody there," and Mr. Wines may have been told they had made an arrest, although he was not sure. After they arrived, nothing further was said to suggest the police had any suspect or to indicate which individual was the target. As set forth above, the Court rejects the defendant's suggestion that Det. Stone referred to the individuals as "suspects." The individuals were simply asked to view the lineup and advise the detective if they recognized anyone.

In any event, the defendant has not shown how the suggestion that the police have a suspect makes the lineup procedures unfair as to this defendant. The detectives did

nothing to suggest the selection of the defendant over other individuals in the lineups. Nor

has the defendant shown that the mere suggestion to the witness that the police have a

suspect itself causes the procedures to be suggestive. Indeed, it would be natural for any

witness asked to drive down to the police station to view a lineup to assume that the police

had someone that they suspected.

While it might be preferable for officers not to mention that they have a suspect and

even to advise the witness that they may not recognize anyone, defendant has cited no

cases suggesting the mere fact that a witness has been advised that the police have

"somebody there" makes a lineup unduly suggestive. <u>See</u> <u>United States v. Bowman</u>, 215

F.3d 951, 965-66 (9th Cir. 2000) (lineup not impermissibly suggestive though witnesses

knew suspects were in custody and had not been interviewed before viewing lineup).

Defendant cites to a research report published by the Department of Justice (DOJ)

and the National Institute of Justice, <u>Eyewitness Evidence, A Guide for Law Enforcement</u>

(Department of Justice, 1999) ("<u>Guide</u>"), attached as an exhibit to the Government Brief

(Doc. # 181), which recommends that police not suggest that they have a suspect and

further advise witnesses that the person who committed the crime may or may not be

present. As the government notes, however, the <u>Guide</u> is not binding on the DOJ, and it

specifically notes that the opinions or points of view expressed in the document "represent

a consensus of the authors and do not necessarily reflect the official position of the U.S.

Department of Justice." <u>Guide</u>, at ii. As such, it has no binding effect. <u>San Pedro v.</u>

<u>United States</u>, 79 F.3d 1065, 1070 (11th Cir. 1996) (U.S. Attorney Manual provides

guidance only and does not have the force of law).  The <u>Guide</u> further states that it is "not intended to state legal criteria for the admissibility of evidence," that careful adherence to its practices is most important when eyewitness identification is the sole evidence, and that the failure to follow the practices recommended in the <u>Guide</u> "will not necessarily invalidate or detract from the evidence in a particular case."  <u>Guide</u> at 2-4.  In addition, no validation studies were done to determine the significance or degree of improvement in eyewitness evidence the practices were expected to yield.  <u>Id.</u> at 8.  Moreover, the Court notes that no such comments were made to Ms. Ruffin, and she also identified the defendant from the lineup.

Based on the record as a whole, including a review of the photographs of the lineups themselves, the defendant has not shown that the identification procedures used were unduly suggestive.  In light of this conclusion, it is unnecessary to address the reliability of the identification testimony.  Assuming, <u>arguendo</u>, the identification procedures were unduly suggestive, defendant's suppression motion still fails because identifications made by each of the three eyewitnesses are nonetheless reliable.

In this instance, the evidence is strong on each of the <u>Biggers</u> factors.  Each of the witnesses had a good opportunity to view the shooter.  Ms. Coser observed almost the entire incident from only 20 feet away, and the shooter thereafter passed directly in front of her car.  Mr. Wines observed the shooter more than once, and upon leaving the scene the shooter passed directly in front of him and the two made eye contact.  Although Ms. Ruffin observed the defendant from slightly further away, he was relatively close to her

when he stopped at the sign, and by then Ms. Ruffin was making a concerted effort to observe him.  Each of the witnesses also paid close attention to the incident and to the shooter, and the witnesses testified that they made an attempt to observe the shooter so that they might be able to assist.  Each of the witnesses was also confident after the incident that they would be able to identify the shooter at a later time, and each was certain of their identification when he or she viewed the lineup.  Finally, only five or six hours passed from the time of the incident until the lineups.  See United States v. Lank, 108 F.3d 860, 862 (8th Cir. 1997) (identification that occurred same day reliable).

The defendant suggests that the lineups are unreliable because the event was a traumatic one.  But if that were the case, few witness identifications of any violent incident could ever pass muster.  Indeed, while the traumatic or violent events may cause some persons to be less able to focus on the incident, such events cause others to focus more intently.  In this case, having listened to the witnesses and observed their manner when testifying, the undersigned finds credible their testimony that each paid very close attention in case they needed to be able to describe the shooter.  For most, if not all, of the time, none of the witnesses felt himself or herself to be in imminent danger.  Moreover, two of the eyewitnesses were extremely well equipped from their training to be able to pay close attention to potentially dangerous situations:  Ms. Ruffin was a security guard and Mr. Wines previously worked in the jail and provided secondary as a security guard.  All of the witnesses had some familiarity with firearms.

Nor do the differences between the descriptions given by the witnesses cause the

Court to doubt the reliability of the identifications. Overall the differences between the witnesses' descriptions are relatively minor, with height varying a few inches and weights fairly close. While the age ranges were quite different, age can be quite difficult for many people to estimate, and the Court notes that Bolden, Sr., is a relatively young-looking man. That all three witnesses independently identified the same individual also bolsters the reliability of the identifications. United States v. Rogers, 73 F.3d 774, 778 (8th Cir. 1996) (identification reliable where at least two other witnesses identified the defendant).

Finally, although the undersigned is not relying on the strength of the government's case in making this determination, the Court notes that the other evidence presented makes the case of mistaken identification extremely remote. Kennaugh v. Miller, 289 F.3d 36, 48 (2d Cir. 2002); Rogers, 73 F.3d at 778. Among other things, here the defendant's car was identified and was located in a place consistent with the direction the shooter traveled; the defendant admitted going to that area that day; a co-defendant admitted his own involvement and identified the defendant as the shooter; ammunition consistent with that used was located at the defendant's residence; and a firearm consistent with that used was found hidden outside the defendant's residence. As such, the lineup identifications should not be suppressed.

### 7.  October 8, 2002 Consent to Search

The next morning following his arrest, defendant Bolden, Sr., was brought back to the police station, and he provided consent to search the residence at 1157 Howell. Defendant seeks to suppress the box of bullets and the electric bill seized as a result of that

search, asserting that the defendant's consent was not voluntary.

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir.) cert. denied, 519 U.S. 1011 (1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir.) cert. denied, 513 U.S. 886 (1994). However, the consent need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his right to refuse to consent in order to make the consent voluntary. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. Chaidez, 906 F.2d at 380-1. Voluntariness is a fact question to be determined from the totality of the circumstances present. Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164, 171 (1964). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001); see also United States v.

Hatlock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, at 381. Moreover, "[t]he precise questions is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe he consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001).

Applying these factors to the facts in this case, the Court finds both that the defendant's consent to search was voluntary and that the officers were reasonable in believing the defendant had voluntarily consented. The defendant at the time was a 39-year-old adult capable of reading and understanding the consent to search form. He did not appear to be under the influence of drugs or alcohol. He was orally advised of his Miranda rights prior to consenting to the search, and Det. Hanewinkel would have advised him that he did not have to consent to the search, which is considered to be a "significant" factor in determining voluntariness. United States v. Pulliam, 265 F.3d 736, 741 (8th Cir.

2001). The form signed by him confirmed defendant's understanding that he had a right to refuse consent. Govt. Ex. 10. The defendant also has prior convictions, such that he would have been aware of the protections of the legal system. Moreover, the defendant had refused to take a gunshot residue test the night before, further reflecting defendant's awareness of his ability to withhold consent.

Nor does anything in the environment surrounding the request suggest the consent was anything but voluntary. The request was made at 12:30 p.m. By then the defendant had been in custody for approximately 16 hours, but during that period the detectives had questioned the defendant for only approximately 10-15 minutes the night before and had made no attempt to further question the defendant prior to requesting consent to search. The detectives requesting consent on October 8 were different than those who interviewed the defendant the previous night, thereby further minimizing any possible coercive effect. The defendant was not threatened or intimidated, and no promises were made to induce his consent. The written consent to search form signed by him further confirmed that "no promises, threats, force or physical or mental coercion of any kind whatsoever" were used to get him to consent to the search. Id.

Defendant asserts that the consent was involuntary because the defendant was diabetic and had requested food, but was not furnished food before he signed the consent to search form. This argument fails for several reasons. The defendant presented no evidence of defendant's medical condition and nothing upon which this Court could base an assessment of whether defendant's medical condition would have required food at that

time or the impact upon his mental state if he did not receive food.  Additionally,

defendant at no time suggested to the officers that he required food because of any

medical need, as opposed to merely desiring something to eat.  Indeed, from the evidence

it appears that defendant would have had both breakfast and lunch available to him in the

holdover prior to meeting with the detectives.  Nor was there anything about defendant's

appearance or behavior that suggested that he was in a state of medical distress.  To the

contrary, his ability to understand what was occurring and respond intelligently is

illustrated by the fact that the defendant advised the detectives that his only concern was

that the door to the residence not be broken, and his subsequent identification of the house

key for the detectives.  On this record, the Court finds that defendant's consent to search

was both voluntary and intelligent.  See United States v. George, 987 F.2d 1428, 1431 (9th

Cir. 1993) (consent to search voluntary where defendant answers responsive, though

defendant in emergency room recovering from drug overdose); United States v. Mason,

966 F.2d 1488, 1494 (D.C. Cir.) (consent to search voluntary although defendant had been

shot, was in hospital and in pain, where defendant appeared coherent and capable of

making decision), cert. denied, 506 U.S. 1040 (1992); United States v. Rambo, 789 F.2d

1289, 1297 (8th Cir. 1986) (consent to search voluntary despite possibility that it was

given under the influence of narcotics where defendant responded rationally and

coherently and no evidence of coercion).  See also United States v. Mendoza-Cepeda, 250

F.3d 626, 629 (8th Cir. 2001) (consent to search voluntary though defendant spoke little

English where defendant appeared to understand the request to search).

**8.  Statements Following October 8 Search of 1157 Howell**

Following the search, the detectives advised the defendant what they had seized,

and in response the defendant advised Det. Hanewinkel that he had previously owned a

.22 rifle.  Defendant asserts that the statement should be suppressed as the fruit of an

invalid search.  This argument fails, as the Court finds that the search was pursuant to

defendant's voluntary consent to search.  In addition, there is nothing to suggest the

statement was involuntary.  The defendant had been advised of his <u>Miranda</u> rights prior to

the search, and their discussion with him following the search occurred less than 1½ hours

later.  In the interim, the defendant was sitting in a room, alone, and was permitted to eat

the food he had requested.  Nor does it appear that the statement by defendant was made

in response to any question by the detectives.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291,

300-01 (1980) (interrogation limited to words or actions police know are reasonably likely

to elicit an incriminating response); <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir.

1996), <u>cert. denied</u>, 520 U.S. 1179 (1997) (statement was prompted by discovery of illegal

drugs in home and not police interrogation or coercion).

**9.  Search of Yard and Seizure of Firearm on January 16, 2003**

a.  Defendant's Expectation of Privacy

Defendant seeks to suppress the firearm seized from the backyard of the Howell

residence on January 16, 2003.  A defendant moving to suppress evidence has the burden

to show that he has a legitimate expectation of privacy in the area or object searched.

<u>United States v. Pierson</u>, 219 F.3d 803, 806 (8th Cir. 2000); <u>United States v. Gomez</u>, 16

F.3d 254, 256 (8th Cir. 1994).

> "Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case."

Id. Elsewhere, the Eighth Circuit has described the analysis as a two-part test that requires the defendant to show both (1) a subjective expectation of privacy and (2) that the expectation is objectively reasonable, or "one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999); see also United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994). Among the facts relevant to the showing are "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." McCaster, 193 F.3d at 933. To meet the first part of the test with regard to items seized, the defendant must show by his conduct that he sought to preserve the item as private. Stallings, 28 F.3d at 60.

In this instance the Court concludes that the defendant has not met his burden to establish that on January 16, 2003, more than three months after his arrest and approximately one year after he stopped paying rent, the defendant had a legitimate expectation of privacy in either the premises at 1157 Howell or the bag stashed under the guttering in the backyard. Sometime soon after his arrest, defendant had lost any subjective expectation of privacy he had in the residence. He had paid only a portion of the rent due

in January and February 2002, and had not paid any rent since March 2002. Once he stopped paying rent, he also stopped returning Ms. Granberry's calls.[11] He was well aware of the terms of his written lease and knew that the lease expired on May 1, 2002. Ms. Granberry attempted to serve him at the Howell address by certified mail with a letter requiring him to make payment within three days or be evicted, and those letters were returned undeliverable. In the weeks prior to his arrest, Ms. Granberry's handyman finally reached the defendant and advised him in person that he had to make payment or he would be evicted. The defendant made no effort either to pay Ms. Granberry or to attempt to negotiate some extended terms for payment.

Although the defendant attempts to characterize Ms. Granberry's actions as attempts to work things out, the Court specifically rejects this characterization as not supported by either Ms. Granberry's actions or her testimony. Prior to his arrest, the defendant knew that he needed to make immediate payment or be evicted, and that his lease term had expired. United States v. Reyes, 908 F.2d 281, 285 (8th Cir. 1990) (no legitimate expectation of privacy in bus locker after expiration of rental period). Consistent with her advice to defendant, Ms. Granberry thereafter took steps to evict the defendant and obtained a judgment of eviction almost two months before the search. Assuming, as defendant suggests, that he believed in early October that Ms. Granberry still might be

---

[11] In his post-hearing brief, the defendant suggests that calls from Ms. Granberry were returned within a few days, but that pertained only to the time period in January and February 2002. Thereafter, defendant's telephone was disconnected and he stopped returning phone messages left at his place of business.

willing to reach some accommodation with him, he took no steps to attempt to reach any such accommodation.  See United States v. Perez-Guerrero, 334 F.3d 778, 781-2 (8th Cir. 2003) (defendant lacked standing to challenge search of motel room where checkout time had elapsed); United States v. Larson, 760 F.2d 852, 854-55 (8th Cir.) (no legitimate expectation of privacy in motel room where rental period elapsed and defendant did not sufficiently communicate with motel personnel his intention to renew the term), cert. denied, 474 U.S. 849 (1985). See also United States v. Poulsen, 41 F.3d 1330, 1331 (9th Cir. 1994) (no expectation of privacy where claimant aware that storage facility manager would seize property for non-payment of rent); Reyes, 908 F.2d at 285 (no legitimate expectation of privacy in bus locker after expiration of rental period).

By mid-January 2003, when the search occurred, defendant no longer possessed the premises.  He had not physically occupied the premises for more than three months, and his children no longer lived there.  Nor did he take any actions personally, through his children, or through his attorneys to assert any continued possessory interest in the premises or any property located in or on the premises.  He did not have the ability to exclude others from the premises, as shown by the fact that the property had been seriously vandalized and by the fact that in December 2002 Ms. Granberry retook possession of the premises and thereafter changed the locks.

Defendant relies on the fact that he maintained a key to the residence, that the detectives had requested and received consent to search in October, and that the residence was still locked when Agent McGinnis went to search for the firearm in January.  None of

these facts are persuasive, however.  Like in <u>Reyes</u>, defendant did not actually possess the key; it had been lawfully seized from him and was in police custody, and the locks were thereafter changed.  While the residence was locked in mid-January 2003, also like in <u>Reyes</u>, it was no longer the defendant who controlled when the premises would be locked or unlocked.  Nor does the fact that he consented to a search on October 8, 2002, provide any evidence of defendant's subjective expectation in January 2003, when he had neither lived at the premises nor paid any rent for over three months.  Under the circumstances, consistent with both the lease and his landlord's advice to him, the only reasonable expectation defendant could have had was that Ms. Granberry would assume possession and attempt to repair and re-lease the premises – which she did in fact do.

Nor is the Court persuaded by the fact that defendant did not receive written notice more than 30 days prior to the eviction, or by the failure to notify the defendant in jail of the actual eviction.  Defendant offers these facts as evidence that the defendant would have maintained a subjective expectation of continued possession.  Defendant bears the burden to establish a subjective expectation of privacy, however, and he did not provide any testimony or other evidence whatsoever of any reliance on the failure to provide written notice.  Moreover, the evidence shows that on October 30, 2002, the Sheriff mailed the summons and complaint to the defendant and posted it on the door.  See Exhibits to Defendant's memorandum in support of motion to suppress (Doc. # 120).  Indeed, defendant's assertion that service at the Howell address is somehow ineffective to provide notice would appear, if anything, to provide further evidence that the defendant had no

expectation of privacy in the residence. The defendant apparently had no expectation that mail delivered to the Howell address would reach him, nor did he take any steps to assure it would. Defendant cannot have it both ways – either he was provided adequate notice of the eviction and chose to do nothing or he had abandoned any expectation of privacy.

The absence of any subjective expectation of privacy in the bag that contained the firearm is even more evident. As set forth above, there is absolutely no evidence that by January 2003 the defendant retained any subjective expectation of privacy in the residence where the bag and any other personal items were left. Moreover, the bag was left outside, in a yard that was not fully fenced. At least by January 16, 2003, the bag itself was not totally concealed and would have appeared as trash. Defendant's name was not on the bag and it was not secured in any fashion. As such, defendant also failed to meet this initial burden with respect to the bag containing the firearm. Stallings, 28 F.3d at 60-61.

Because defendant has failed to demonstrate a subjective expectation of privacy in either the residence or the bag containing the firearm, any examination of the second part of the test is unnecessary. Id. at 61. Even if the Court assumed defendant met his burden to establish a subjective expectation of privacy, under these facts that expectation would not be reasonable. Summarizing just some of the facts, by January 2003, defendant had not paid rent for almost one year; his lease had been expired for more than six months; he had not lived at the residence for more than three months; his children no longer lived at the residence; the property had been seriously vandalized; and the landlord had obtained a judgment of eviction and had retaken possession of the premises. The item itself was left

in a plastic bag under guttering in the backyard of the premises.  Under these facts, any expectation of privacy defendant may have had was not reasonable, and the undersigned does not believe that society is prepared to accept any such expectation as reasonable.

        b.  <u>Abandonment</u>

For similar reasons, the Court also finds, in the alternative, that the defendant abandoned the bag containing the firearm.  "A warantless search of abandoned property does not violate the Fourth Amendment, as any expectation of privacy in the item searched is forfeited upon its abandonment."  <u>United States v. Mar James</u>, 353 F.3d 606, 615-16 (2003).  <u>See</u> <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960); <u>United States v. Segars</u>, 31 F.3d 655, 658 (8th Cir. 1994) (defendant dropped package and fled), <u>cert. denied</u>, 513 U.S. 1099 (1995);  <u>United States v. Hoey</u>, 983 F.2d 890, 892 (8th Cir. 1993) (abandoned apartment).  The  government bears the burden of establishing that property has been abandoned.  <u>Hoey</u>, 983 F.2d at 892.  "The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his or] her reasonable expectation of privacy so that the search and seizure is valid."  <u>Id.</u> at 892-3.

The question of whether the defendant intended to abandon the property "may be inferred from words spoken, acts done, and other objective facts, and all the relevant circumstances at the time of the alleged abandonment should be considered."  <u>Id.</u> at 982. The determination of whether abandonment has occurred is not a subjective one, based on the owner's intent, but rather is an objective analysis, based on all the objective facts and

circumstances available to the investigating officers.  United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999); United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997), cert. denied, 552 U.S. 1601 (1998).  Two important factors in this analysis are "denial of ownership and physical relinquishment of the property."  Tugwell, 125 F.3d at 602; see also Mar James, 353 F.3d at 616.  However, a verbal disclaimer of ownership is not required.  Liu, 180 F.3d at 960.  See also United States v. Hodari D., 499 U.S. 621, 624, 629 (1991).

While the abandonment cannot be the product of unlawful police conduct, "[t]he existence of a police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary."  Segars, 31 F.3d at 658 (quoting United States v. Jones, 707 F.2d 1169, 1172 (10th Cir. 1983)); see also Hodari D., 499 U.S. at 626 (defendant fled on approach of police and threw down drugs while fleeing);  Liu, 180 F.3d at 960-962 (defendant left train after police questioning, leaving behind luggage);  United States v. Willis, 967 F.2d 1220, 1223 (8th Cir. 1992) (defendant abandoned shopping bag by dropping it in parking lot, with police in pursuit).

Defendant Bolden left the bag containing the firearm on the ground in the backyard. While the Court agrees with the defendant that the location of the bag does not weigh as strongly in favor of abandonment as did the open field where the bag was left in Stallings, it is relevant that the bag was left in an open backyard, subject to the elements, for a considerable period of time.  And in one respect the facts here are stronger than in Stallings, for here the gun was not left in a zippered tote bag, but would have appeared as

garbage, in an unlabelled plastic bag, lying on the ground under guttering. Moreover, the defendant knew in the weeks prior to his arrest that the landlord was going to evict him if he did not bring his rent current, and yet he did nothing. The terms of the lease he signed permitted the landlord in such circumstances to have him and his possessions evicted from the premises, and to consider his property abandoned. Govt. Ex. 15, ¶¶ 5 & 22. Cf. United States v. Poulsen, 41 F.3d 1330, 1331 (9th Cir. 1994) (standing case; claimant aware that storage facility manager would seize property for non-payment of rent). Indeed, soon after his arrest the landlord did in fact obtain an judgment of eviction. Yet for more than three months following his arrest, the defendant did nothing to attempt to reclaim or retrieve the bag containing the firearm. This provides strong evidence of abandonment. United States v. Chandler, 197 F.3d 1198, 1200-01 (8th Cir. 1999) (suspended police officer left duty bag full of narcotics in police station for eight months and never inquired to claim bag). Any belief that defendant claims to have had that this conduct would somehow be acceptable to his landlord is both unsupported by the evidence and objectively unreasonable. Reyes, 908 F.2d at 286. That defendant was prevented from returning to the premises by his arrest has little if any effect. See United States v. Perez-Guerrero, 334 F.3d 778, 782 (8th Cir. 2003); Reyes, 908 F.2d at 285-6.

Like in Chandler and Liu, defendant's conduct is most consistent with "abandoning the items with the hope that they would prevent association with the contraband." Mar James, 353 F.3d at 616. As further evidence of a desire to disassociate himself from the handgun, the Court notes that defendant Bolden, by implication, denied owning a .22

handgun and explained ownership of the ammunition found during the search by telling police that he used to own a .22 rifle. Based on all of these facts and circumstances, the Court finds that the defendant abandoned the bag containing the firearm.

Having determined that the defendant failed to establish a reasonable expectation of privacy in the Howell property and the bag containing the firearm, and that the government met its burden to establish that the items were abandoned, it is unnecessary for the Court to address the remaining arguments offered by the government in opposition to suppression of the firearm. Nonetheless, the Court will address the arguments for the benefit of the district court.

### c. Exigent Circumstances

The undersigned is not persuaded by the government's assertion that the warrantless search in January 2003 was justified by exigent circumstances and the public safety exception. "[A] search without a warrant is legal when 'justified by both probable cause and exigent circumstances.'" United States v. Kleinholz, 339 F.3d 674, 676 (8th Cir. 2003) (quoting United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002)). Exigent circumstances have been found where officers are in hot pursuit of a felon, where there is perceived danger to the safety of the officers or the public, where a suspect is likely to escape, undetected, or where evidence is likely to be destroyed. See Warden v. Hayden, 387 U.S. 294, 298-99 (1967); United States v. Wihbey, 75 F.3d 761, 766 (1st Cir. 1996); United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994). Where, as here, entry is made without a warrant, the burden rests with the government to

show exigent circumstances.  <u>Walsh</u>, 299 F.3d at 732; <u>Parris</u>, 17 F.3d at 229.

Exigent circumstances permitting a warantless entry and search have been found where the police reasonably believe their own safety is at risk, or where police reasonably fear for the safety of someone inside the premises.  <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978); <u>Hayden</u>, 387 U.S. at 298-99.  The reasonableness of the officers' behavior is measured by an objective standard; the government must establish that under the circumstances, it was reasonable for experienced officers to fear for their own safety or the safety of someone inside the residence.  <u>United States v. Kuenstler</u>, 325 F.3d 1015, 1021 (8th Cir. 2003) (determination based on whether reasonable, experienced officers would have been legitimately concerned for the safety of officers on the scene); <u>see also</u> <u>United States v. Richardson</u>, 208 F.3d 626, 630 (7th Cir.) (reasonableness of warrantless entry following 911 call reporting woman had been raped and murdered measured by objective standard), <u>cert. denied</u>, 531 U.S. 910 (2000);  <u>Tierney v. Davidson</u>, 133 F.3d 189, 196-97 (2d Cir. 1998) (police may enter dwelling without warrant if, based on objective standard, they reasonably believe individual is in distress).  That officers may have an ulterior motive in entering the premises "does not render a search illegal in a situation where officers have objectively reasonable safety concerns."  <u>Kuenstler</u>, 325 F.3d at 1022.

The government argues that Agent McGinnis was justified in obtaining the firearm to avoid the possibility of anyone possibly being injured by the potentially loaded firearm lying in the yard.  The government cites three cases in support of its argument:  <u>United States v. Antwine</u>, 873 F.2d 1144 (8th Cir. 1989); <u>United States v. Hill</u>, 730 F.2d 1163 (8th

Cir. 1984); and United States v. Wells, 702 F.2d 141 (8th Cir. 1983).  Each of these cases is distinguishable, however, because in each, the police were then at a scene where they knew a potentially dangerous firearm to be present.  And in each, the officers had concern either for their own safety at the scene or for the safety of others known to be present. While the Court finds that Agent McGinnis believed, in good faith, that immediate action was necessary to prevent possible injury or the loss of critical evidence, the determination is not based on the agent's subjective belief, but rather, is an objective determination. Here, the undersigned does not believe that belief was reasonable.  At the time of the search the firearm, if still present, had been sitting in the same place, without discovery, for several months.  Based upon the information received at the proffer, it also appeared that the firearm was not sitting out in the open, but rather was concealed under the guttering.  In addition, the agent was advised of the presence of the gun, not while at the scene, but while inside the courthouse, during working hours.  There was nothing to prevent the agent from arranging to secure the residence while he sought a search warrant.  Although the government asserts that the area was open to public view and therefore subject to a lesser expectation of privacy, it does not assert that this area, immediately adjacent to the house and enclosed on the side by fencing, was outside the curtilage that is subject to Fourth Amendment protection.  As such, the government has not met its burden to establish exigent circumstances.  See United States v. Morales, 171 F.3d 978, 982 (5th Cir. 1999) (no exigent circumstances where officers could have guarded warehouse with little or no danger to themselves while search warrant obtained);  United States v. Pierson, 219 F.3d

803, 806 (8th Cir. 2000) (belief regarding need to safeguard evidence not reasonable where both suspects under control); United States v. Morgan, 743 F.2d 1158, 1162-63 (6th Cir. 1984) (no exigent circumstances when officers not in hot pursuit and not responding to emergency).

      d.  Inevitable Discovery

Finally, the government asserts that the firearm is nonetheless admissible under the "inevitable discovery" doctrine. This argument poses a closer and more difficult question. The inevitable-discovery exception to the exclusionary rule permits the admission of illegally obtained evidence if the evidence would have inevitably been discovered through independent legal means. To meet this exception, the government must show two elements: (1) the existence of "an ongoing line of investigation distinct from the impermissible or unlawful technique" and (2) a reasonable probability, as demonstrated by a preponderance of the evidence, that the evidence would have been discovered through the permissible line of investigation. United States v. Villalba-Alvardo, 345 F.3d 1007, 1019-20 (8th Cir. 2003). See, James, 353 F.3d at 617; United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). As explained in Nix v. Williams, 467 U.S. 431 (1984), application of the principle requires the Court to put the parties in the positions they would have been in had the illegal conduct not taken place.

> Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that

> evidence from the jury in order to ensure the fairness of the trial proceedings.
> In that situation, the State has gained no advantage at trial and the defendant
> has suffered no prejudice.  Indeed, suppression of the evidence would operate
> to undermine the adversary system by putting the State in a worse position
> than it would have occupied without any police misconduct.

Id. at 447.  The proper focus is "not on what the officers actually did after unlawfully

recovering evidence, but on what the officers were reasonably likely to have done had the

unlawful recovery not occurred."  Villalba-Alvardo, 345 F.3d at 1020.

The government asserts that had the agent not believed that exigent circumstances

necessitated the immediate seizure of the firearm, the agent would have searched the

premises with consent of the landlord, as it did some six days later, or obtained a search

warrant, and that such a search would have yielded the firearm.  The defendant asserts that

the government has not sufficiently shown that it was planning to search the premises, and

that the agents deliberately bypassed the warrant process because they knew that the

information was stale and unreliable and would not have supported a warrant.  Defendant

further asserts, from a policy perspective, that an unlawful search cannot be salvaged by

later initiating a lawful avenue of obtaining the same evidence and thereafter claiming

inevitable discovery.

Here, the government has met its burden to establish that it was pursuing a

substantial alternative line of investigation.[12]  At the time, the agent was obtaining the

---

[12]  The degree to which the independent line of investigation must actually be on-going at the time of the search is not entirely clear.  The concept has evolved since its declaration in 1984, and the circuits are not in agreement.  United States v. Hammons, 152 F.3d 1025, 1029 n.4 (8th Cir. 1998) (recognizing split);  United States v. Kennedy, 61 F.3d 494, 498-9 (6th Cir. 1995)

proffer of one of the co-defendants in the case, Dominick Price, and was gathering evidence through that process and other investigation. The defendant's residence was still of interest, as shown by the fact that a few weeks prior to the proffer Agent McGinnis had driven by the residence, knocked on the door, and talked with neighbors. There was good reason to believe that the gun might still be at the residence, as the defendant had apparently hidden it well the same day he was arrested and the defendant had not thereafter been released. Agent McGinnis credibly testified that he intended to obtain a search warrant for the residence regardless of what he found when he went to the residence on January 16th, and the undersigned is convinced that he would have followed through on his impulse to seek a warrant. Obtaining a warrant proved unnecessary, however, for six days later he was able to search the premises with the consent of the landlord.

It is not entirely clear what is meant by the requirement that the line of investigation be distinct and on-going, but such a finding here is consistent with cases from this and other Circuits. In United States v. Hammons, 152 F.3d 1025 (8th Cir. 1998), the Court found that an officer at a traffic stop improperly opened an envelope in a man's garment as the consent to search was involuntary. The Court nonetheless found the inevitable discovery exception applied based upon the officer's testimony that if he had not obtained

---

(citing conflicting circuit case law), cert. denied, 517 U.S. 1119 (1996). The Court in Hammons was not required expressly to decide this issue.

consent, he would have called a drug dog.[13] "The officer's assertion that he would call a drug dog indicates that the officer had initiated an alternative plan at the time of the constitutional violation: if Hammons did not consent, the officer was prepared to walk back to his patrol car and radio the drug canine unit." Id. at 1030; see also United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003) (even if question regarding immigration status leading to arrest and search were improper, reasonable probability existed that defendant would have been detained, and car towed, leading to inevitable discovery of firearm during inventory search); United States v. Glenn, 152 F.3d 1047, 1050 (8th Cir. 1998) (inevitable discovery applied to firearm where court determined that had officer not improperly conducted a pat-down, for which no reasonable suspicion was found, officer would otherwise have completed the license check and determined the defendant was driving without a license; "reasonable probability" that officer would have arrested him for driving without a license and thereafter found the firearm in a search incident to arrest); United States v. Dickson, 64 F.3d 409, 411 (8th Cir. 1995) (even if envelope discovered as a result of an illegal search of apartment, discovery of the envelope merely facilitated the investigation, which would inevitably have led to an application for a search warrant not necessarily dependent upon the connection to the apartment); United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994) (assuming consent search unlawful, evidence admissible because car was unregistered, and thus could not have been driven,

_____

[13]   In the opinion the Eighth Circuit assumes that the officer had not yet called for the drug dog at the time he requested consent.  Hammons, 152 F.3d at 1029, n.3.

and therefore would surely have been impounded and subjected to inventory search);

United States v. McConnell, 903 F.2d 566, 570 (8th Cir.) (illegal search of briefcase

incident to arrest; inevitable discovery doctrine applied as search of briefcase would have

been inevitable under policy of inventorying contents of seized baggage belonging to

arrestees), cert. denied, 499 U.S. 938 (1990).  Here, as in Hammons, the government has

met its burden to show that at the time of the alleged constitutional violation it was actively

pursuing a line of investigation, which included further examination of the residence and

the interview of a co-defendant.  But for the agent's unfounded belief that immediate action

was required to protect public safety, the agent most assuredly would have obtained a

warrant to search the area.  And had he not readily found the firearm on January 16, he

would have obtained a search warrant.

Likewise, there is little doubt that the firearm would have been discovered through

the permissible line of investigation.  It must be remembered that there was nothing

improper about the proffer itself, and once the location of the firearm was disclosed, it was

readily discoverable.  From a factual standpoint, there is little if any doubt that a search

pursuant to a warrant or consent conducted hours – or even days – later would have led to

the discovery of the firearm. That the agent could have obtained consent to search is shown

by the fact that he did in fact obtain the landlord's consent to search six days later.  The

landlord's consent was in no way dependent upon the arguably tainted evidence, as the

agent did not disclose the discovery of the firearm to her.  United States v. Boyd, 180 F.3d

967, 976 (8th Cir. 1999) (even if protective sweep during which bag found was invalid,

physical evidence would inevitably have been discovered during the search of the house which occurred after girlfriend later gave consent to search).

Nor does the Court accept defendant's assertion that there was no probable cause for a search warrant. There is no basis for concluding that the information from Price was unreliable; to the contrary, in light of the pending charges he had every reason to provide accurate and useful information. There was also substantial other evidence of the defendant's involvement and possession of the firearm, including the observations of eyewitnesses who had seen the defendant with the firearm. And though the information defendant gave to Price was several months old, it was quite probable that the firearm was still there; defendant Bolden had been in custody since the time he hid the firearm, and it was apparently sufficiently well hidden at the time that it was not discovered during the search that took place the day following defendant's arrest.

The Court also rejects defendant's assertion that the agent took this course because he knew he could not obtain a search warrant. Based upon the testimony, the Court finds that the agent had a good faith subjective belief that the public safety exception required immediate action, and but for that belief, he would have obtained a warrant or consent to search.

Defendant cites <u>United States v. Satterfield</u>, 743 F.2d 827, 846 (11th Cir. 1984), for the proposition that agents cannot salvage an unlawful search by later initiating a lawful avenue to obtain the evidence and thereafter claim they inevitably would have found the evidence. <u>Satterfield</u> was decided before <u>Murray v. United States</u>, 487 U.S. 533 (1988), a

case under the related independent source doctrine,[14] which discussed and shed further light on the inevitable discovery doctrine.  In <u>Murray</u>, officers, misguided in their belief that exigent circumstances warranted entry to apprehend possible participants and preserve evidence, unlawfully entered a warehouse and observed marijuana in plain view.  The officers then left and obtained a search warrant, without disclosing to the judge what they had seen during their prior entry, and thereafter seized the marijuana pursuant to the search warrant.  There, as here, the defendants argued that a rule that permitted use of the evidence seized would remove all deterrence to, and in fact encourage, unlawful police searches.  <u>Id.</u>, 487 U.S. at 539.  Relying on the language in <u>Nix</u>, the Court held that the marijuana would be admissible under the independent source doctrine where the search pursuant to the warrant was in fact "a genuinely independent source of the information and tangible evidence at issue."  <u>Id.</u>  The Court further explained that such would not be the case if the decision to seek the warrant was prompted by what they had seen during the prior unlawful entry, or if information from the unlawful entry was presented to the magistrate judge and affected his decision.  <u>Id.</u>  Inasmuch as the Court described  the inevitable discovery doctrine as "in reality an extrapolation of the independent source doctrine," <u>id.</u>, the reasoning in <u>Murray</u> undercuts the reasoning in <u>Satterfield</u>.

---

[14]  Had the agent improperly entered onto the premises and located the gun, but not seized it, and thereafter obtained consent or a search warrant, without relying on the improper viewing of the firearm, and seized the firearm during the subsequent search, the firearm would have been admissible under the independent source doctrine and the facts of <u>Murray</u> and <u>Segura v. United States</u>, 468 U.S. 796 (1984).

For this and other reasons, the holding in <u>Satterfield</u> appears to have been limited in one respect by later case law from the Eleventh Circuit, <u>see</u> <u>United States v. Hernandez-Cano</u>, 808 F.2d 779, 783 (11th Cir. 1987), and its approach has been rejected by several other circuits.  <u>See</u> <u>United States v. Kennedy</u>, 61 F.3d 494, 498 (6th Cir. 1995) (distinguishing <u>Satterfield</u>); <u>United States v. Ford</u>, 22 F.3d 374, 377-78 (1st Cir. 1994) (disagreeing with inflexible approach of <u>Satterfield</u>); <u>United States v. Herrold</u>, 962 F.2d 1131, 1143 n.12 (3d Cir.) (recognizing some of the reasoning of <u>Satterfield</u> undercut by <u>Murray</u>), <u>cert. denied</u>, 506 U.S. 958 (1992).

It does not appear that the Eighth Circuit has ruled on this precise argument, but the approach in <u>Satterfield</u> does not appear to be in step with Eighth Circuit cases.  In <u>Dickson</u>, 64 F.3d at 411, the Court held that an envelope discovered during an illegal search would inevitably have been discovered, as police would inevitably have applied for a search warrant not necessarily dependent upon the unlawful information.  <u>See also</u> <u>United States v. Lyons</u>, 957 F.2d 615, 617 (8th Cir. 1992) (assuming drug dog's actions in tearing open package constituted an unlawful "search," inevitable discovery rule applied as had dog simply alerted, the officers would have had probable cause to obtain a search warrant, which would have led to the discovery of the evidence).

Indeed, in <u>United States v. Madrid</u>, 152 F.3d 1034 (8th Cir. 1998), the Eighth Circuit had the opportunity to adopt the rule suggested by the defendant here, but did not do so.  Although such an argument was asserted and would have cleanly disposed of the case, the court did not hold that the inevitable discovery doctrine was inapplicable in all

cases where the police, armed with probable cause, did not get a search warrant and later argued that they would have discovered the evidence through such a search warrant.[15] Rather, the court found the severity of the police misconduct to be relevant, and specifically limited its holding denying application of the inevitable discovery rule to situations where the police "exploited their presence in the home like they did." Id. at 1041. Comparing the facts there to those in Murray and Segura v. United States, 468 U.S. 796 (1984), where the law enforcement officers had not exploited the unlawful conduct, the Court in Madrid found that "[t]he offensiveness of the officers' actions in this case, by contrast, is not limited to seizure of the premises, but extends to the detention of occupants and the continued, prolonged, illegal search by wandering officers." Madrid, 152 F.3d at 1041. In the instant case, there was no such misconduct, and the agent in no way exploited the situation. Consistent with his belief that a safety concern was present, the agent did not search any area other than the area where he was advised the gun was located. Moreover, in later obtaining consent to search, the agent did not mention the fact that he had found the firearm or use it in any way in obtaining the landlord's consent.

The Court is aware of the difficulty of applying the doctrine of inevitable discovery in the Fourth Amendment context where officers fail to obtain a search warrant, and is mindful of the need to guard against encouraging expediency or shortcuts by law

---

[15] The court also declined to accept "the government's position at oral argument ... that the inevitable discovery doctrine bars application of the exclusionary rule under any and all circumstances in which the police had probable cause to obtain a search warrant." Id. at 1041 n. 9.

enforcement officers.  Cases such as this, like Murray, test the outer boundaries of the

exception to the exclusionary rule.  The undersigned agrees that the exception should not

apply where the government's only argument is that it had probable cause to obtain a

warrant, but simply chose not to seek one, or where the search is conducted in the hopes of

securing probable cause for a later warrant.  But where, as here, the investigation was on-

going, the agent had probable cause and intended to search the premises and, but for his

good faith belief in exigent circumstances (or some other exception to the warrant

requirement), would have completed that process promptly, application of the exception

should not be foreclosed.  To foreclose application of the exception would put the

government in a worse position than it otherwise would have been in, but for the agent's

allegedly improper conduct – a result Nix sought to avoid.  Cf. United States v. Patane, __

U.S. __, 124 S.Ct. 2620, 2628 (2004) (blanket suppression rule excluding the tangible

fruits of a statement obtained in violation of Miranda "could not be justified . . . by any

deterrence rationale").  Nor is application of the exclusionary rule necessary under these

facts to discourage unlawful behavior by law enforcement.  Here the agent had strong

probable cause.  As the Supreme Court noted in Murray, where there is strong probable

cause, an officer has little incentive to ignore the warrant requirement.  Murray, 487 U.S. at

540.

　　　　Several circuits faced with similar fact scenarios have devised tests to protect against

the exception swallowing the exclusionary rule in the search warrant context.  The Court is

persuaded by the approach of the Second Circuit in United States v. Cabassa, 62 F.3d 470,

473 (2d Cir. 1995), as explained and further detailed in <u>United States v. Lavan</u>, 10

F.Supp.2d 377, 388 (S.D.N.Y. 1998), and followed by the Tenth Circuit in <u>United States v.</u>

<u>Souza</u>, 223 F.3d 1197, 1204 (10th Cir. 2000) (opinion by Hon. Frank Magill, sitting by

designation). The key issue is "how likely it is that a warrant would have been issued and

that the evidence would have been found pursuant to the warrant." <u>Souza</u>, 223 F.3d at

1204.  As more fully described in <u>Lavan</u>, the Court in <u>Cabassa</u> identified four factors

helpful to the determination: (1) the extent to which the warrant process has been

completed at the time those seeking the warrant learn of the search;[16] (2) the strength of the

showing of probable cause at the time the search occurred; (3) whether a warrant ultimately

was obtained, albeit after the illegal entry; and (4) the strength of evidence that the law

enforcement officer "jumped the gun" because they lacked confidence in their showing of

probable cause.  <u>Lavan</u>, 10 F.Supp.2d at 388.  <u>See</u> <u>Cabassa</u>, 62 F.3d at 473-74.  The motion

to suppress should be denied where there is a high level of confidence that, but for the

unlawful conduct, the warrant would in fact have been issued and the specific evidence

would still have been obtained by lawful means.  <u>Souza</u>, 223 F.3d at 1205; <u>Lavan</u>, 10

---

[16]  The court in <u>Cabassa</u> explained that the first factor is relevant because it bears
on the extent to which the warrant would have been obtained and the inevitability of
discovery.  In some cases, if the process of obtaining the warrant has hardly begun, the
probability that the evidence in question would still have been there once the warrant
issued may be less. <u>Cabassa</u>, 62 F.3d at 473.  The latter reasoning has little application
here, where the gun was well hidden.

F.Supp.2d at 389.  Several other circuits have expressed somewhat similar approaches.[17]

Although the court in <u>Madrid</u> did not discuss or use this test, it did in fact examine several

of these same factors in making its determination.

Applying this test, the Court finds application of the inevitable discovery exception

to be appropriate here.  Although the agent had not yet begun the warrant process, he was

still investigating the residence even before the proffer of Price and had gone to the

residence.  Following the proffer by Price, he intended to seek a warrant regardless of what

he found on January 16th.  There is little if any question that a warrant would have been

requested but for the mistaken belief of exigent circumstances.  The showing with respect

to the other factors is quite solid.  As set forth above, prior to the purportedly unlawful

---

[17]    The Sixth Circuit, in this context, has applied the exception when the government can
demonstrate *either* the existence of an independent, untainted investigation that inevitably would
have uncovered the evidence *or* other compelling facts establishing that the disputed evidence
inevitably would have been discovered.  <u>United States v. Kennedy</u>, 61 F.3d 494, 499 (6th Cir.
1995), <u>cert. denied</u>, 517 U.S. 1119 (1996).  The Fourth Circuit also recognized that the inevitable
discovery doctrine may apply where the police had probable cause but failed to obtain a warrant if
the government proves the police would have obtained the warrant absent the illegal search.
<u>United States v. Allen</u>, 159 F.3d 832, 841 (4th Cir. 1998).  <u>See also</u> <u>United States v. Boatwright</u>,
822 F.2d 862 (9th Cir. 1987) (recognizing that a situation other than an alternative line of
investigation might make discovery inevitable, and requiring, at a minimum, that "the fact or
likelihood that makes discovery inevitable arise from circumstances other than those disclosed by
the illegal search itself"), followed in <u>United States v. Thomas</u>, 955 F.2d 207, 210 (4th Cir. 1992).
The First Circuit asks whether the legal means of discovery are truly independent, <u>i.e.</u>, do not rely
on the illegally obtained information; whether both the legal means and the discovery are
inevitable; and whether application of the exception provides incentive for police misconduct or
significantly weakens the protections of the Fourth Amendment.  <u>See</u> <u>United States v. Scott</u>, 270
F.3d 30, 42 (1st Cir. 2001).  The First Circuit may also examine the severity of the police
misconduct.  <u>Id.</u> at 45 & n.9.  <u>But see</u> <u>United States v. Reilly</u>, 224 F.3d 986, 995 (9th Cir. 2000)
(error to apply inevitable discovery based on agents' actual but unexercised opportunity to obtain
search warrant).

search, there was a strong showing of probable cause and a good likelihood that the firearm was still there. A proper search by consent was thereafter obtained, which in no way relied upon anything found during the January 16 search, and a search warrant independent of the seized evidence could likewise have been obtained. And finally, there is no evidence that the agent was intentionally skirting the warrant requirement because he lacked confidence in his ability to obtain a search warrant. Accordingly, even if the other grounds relied upon by the government did not apply, the firearm should nevertheless be admissible under the inevitable discovery doctrine. Boyd, 18 F.3d at 976; Dickson, 64 F.3d at 411. See also Souza, 223 F.3d at 1205-6 (10th Cir. 2000) (where police had probable cause and intended to obtain search warrant, but prematurely caused package to be opened, evidence not suppressible as court confident warrant would have been requested and issued and evidence would have been obtained by lawful means); United States v. Procopio, 88 F.3d 21, 27 (1st Cir. 1996) (contents of briefcase impermissibly searched during inventory search of vehicle admissible where there was little doubt local police would have contacted federal agents, even without having seen the briefcase contents, and such agents surely would have sought search warrant to inspect its contents); United States v. Buchanan, 910 F.2d 1571, 1573-74 (7th Cir. 1990) (cocaine seized during unlawful search of hotel room would inevitably have been discovered, as police would have sought a search warrant for the firearm, even absent the unlawful search and there was probable cause for such warrant based on untainted evidence).

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Identification Testimony [Doc. No. 70] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. No. 73] be **denied**.

**IT IS FURTHER ORDERED** that the government's Motion Regarding Admissibility of Statements [Doc. No. 35] be **denied as moot**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).


_____
AUDREY G. FLEISSIG
United States Magistrate Judge


Dated this 2nd day of September, 2004.