UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATE OF AMERICA,       )
                               )
            Plaintiff,         )
                               )
        v.                     )      No. S1-4:02-CR-557 (CEJ)
                               )
ROBERT BOLDEN, SR.,            )
                               )
            Defendant.         )

**MEMORANDUM AND ORDER**

Pursuant to 28 U.S.C. § 636(b), the Court referred all pretrial motions in this case to United States Magistrate Judge Audrey G. Fleissig for determination and recommended disposition, where appropriate. On September 2, 2004, Judge Fleissig issued a Report and Recommendation Pertaining to Evidentiary Issues with respect to the motion filed by defendant Robert Bolden, Sr. to suppress identification testimony and the defendant's motion to suppress evidence and statements.[1] The defendant has filed objections to the recommendation that his suppression motions be denied. Also, the United States objects to the portion of the Report and Recommendation pertaining to the issue of whether exigent circumstances and the public safety exception justified the warrantless search of the back yard of a residence.

Pursuant to 28 U.S.C. § 636(b)(1), the Court is required to

---

[1] The magistrate judge also addressed the motion of the United States regarding admissibility of statements, recommending that it be denied as moot. No objection is made to this recommendation.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

review *de novo* the findings and conclusions of the magistrate judge to which objection is made. In the instant case, the United States does not object to the magistrate judge's factual findings and, for the most part, nor does the defendant. The Court finds that the factual findings of the magistrate judge as to which no objection is made are fully supported by the evidence adduced during the suppression hearings. Both parties do, however, object to the application of the law to those factual findings. Consequently, in this Memorandum the Court will address the parties' legal objections as well as the factual findings to which the defendant objects.

**I. Defendant's Motion to Suppress Evidence and Statements**

**A. Statements made at police headquarters on October 7, 2002**

The defendant moves to suppress statements he made to the police on the evening of October 7, 2002 while at police headquarters. Several hours earlier that day, a consensual encounter between St. Louis city police officers and the defendant occurred at a house located at 1157 Howell that was then occupied by the defendant. The police, who were investigating the shooting of a security guard at a nearby bank, had arrived at the house upon seeing a vehicle parked there that matched the description of the car driven by the shooter. During the course of the investigation, the defendant's son arrived at the scene and was ultimately transported to police headquarters for questioning.

2

The defendant arrived at police headquarters at approximately 8:30 p.m., having been driven there by a relative, to pick up his son. He was met in the lobby by Detective Jeffrey Stone and agreed to the officer's request to come upstairs to talk. The defendant was not told that he was under arrest at that time. The defendant was then seated in an interview room without handcuffs or other restraints. Det. Stone, without speaking to the defendant, left the interview room for 2-3 minutes.

After Det. Stone returned to the interview room, he handcuffed one of the defendant's hands to the table and went to get another officer, Detective Alan Carroll, so that they could interview the defendant together. The defendant was told that he was a suspect in the shooting, at which point he became angry.

The Miranda warnings were read to the defendant from a card before he was questioned by the officers. In response to the officers' inquiry, the defendant stated that he understood the warnings that were read to him. At no time did the defendant appear to be under the influence of alcohol or drugs, and there was nothing unusual about his demeanor or appearance. The defendant then stated, "I didn't do a mother-fucking thing," after which the officers asked him if he was willing to waive his rights and speak to them about the shooting at the bank. The defendant agreed.

Det. Carroll first asked the defendant whether he would submit to a test for gunshot residue. When the defendant refused, he was

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

asked why and he gave an explanation. As the interview progressed, the defendant was asked and responded to questions about his whereabouts at the time of the shooting. The defendant stated that he wanted to know who was "snitching" on him, to which the officers responded no one. The defendant then said, "I ain't saying another mother-fucking thing I already told you." He did not stop speaking, however, but instead engaged the officers in further conversation, asking questions about his son, about what the officers knew and about what would happen to him. The defendant never requested an attorney, nor did he ever state that he did not want to talk to the officers.

The defendant argues that the magistrate judge erred in rejecting his claim that the police officers were required to cease questioning him when he refused the gunshot residue test and later when he stated, "I ain't saying another mother-fucking thing I already told you." The Court disagrees.

It is undisputed that the defendant was properly advised his rights to remain silent and to counsel before any custodial interrogation took place. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). It is also undisputed that the defendant understood his rights and voluntarily agreed to waive them. When a defendant unambiguously and unequivocally asserts his Fifth Amendment right to remain silent, the police are required to "scrupulously" honor the assertion. Michigan v. Moseley, 423 U.S. 96, 103-104 (1975);

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

see also Miranda, 384 U.S. at 473-74.  However, if the defendant does not invoke his right unequivocally or unambiguously, then further questioning is permissible.  United States v. Al-Muqsit, 191 F.3d 928, 936 (8th Cir. 1999); United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) ("To adequately invoke [the right to remain silent] and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.' United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989).  We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent. See id.").  See also Davis v. United States, 512 U.S. 452, 458-59 (1994)(whether a suspect has actually invoked his right to counsel is an "objective inquiry;" thus, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.").

The Court agrees with the magistrate judge that in this case the defendant did not, either by words or conduct, make a clear and unequivocal assertion of his right to remain silent.  The defendant's refusal to submit to a gunshot residue test cannot reasonably be considered a "clear, consistent expression of a desire" not to talk further to the officers.  Thus, it was permissible for the officers to inquire about his reason for

refusing the test, and the defendant's statements in response to that inquiry will not be suppressed. Similarly, the defendant's statement, "I ain't saying another mother-fucking thing I already told you," did not indicate his unequivocal decision to invoke his right to remain silent when considered with his other statements. A reasonable interpretation of the statement is that the defendant intended continue to say what he had said before. Moreover, because it was the defendant, not the police, who continued the conversation after making the statement, it is reasonable to conclude that the defendant did not wish to cease speaking with the police. Accordingly, the statements the defendant made at the police station on October 7, 2002 will not be suppressed.

### B. Search of the defendant's home on October 8, 2002 and the defendant's atatement after the search

The defendant asserts that the magistrate judge erred in concluding that he voluntarily consented to the search of his home on October 8, 2002, and that he voluntarily made a statement to the police after the search. The undisputed evidence relating to this issue is that the defendant was brought from the police holdover to an interview room at approximately 12:30 p.m. on October 8, 2002, for the purpose of requesting his consent to a search of his residence. Also present in the interview room were two St. Louis police detectives. The defendant's handcuffs were removed and Det. Hanewinkel read the <u>Miranda</u> warnings to the defendant from a card. The defendant stated that he understood his rights and that he was

6

willing to waive them. The defendant asked the detectives if they had anything to eat. However, based on the procedures at the holdover, the defendant would have by then been served breakfast and lunch. The defendant did not appear to be under the influence of alcohol or drugs, nor did he appear to have or suggest that he had any health problems. The defendant at all times appeared to be alert and cognizant of what was happening.

Detective Hanewinkel told the defendant that the police wanted permission to search his home for a weapon. The defendant was then given a blank consent to search form to review. The officers explained the form to him, filled in the blanks, and told him the areas they wished to search. The defendant signed the form, which bore the acknowledgment that "no promises, threats, force or physical or mental coercion of any kind whatsoever" had been employed to secure his consent. The defendant did not ask any questions about the form or the search, but he did state that he did not want his door to be damaged. The defendant was not told that the officers would get a search warrant if he refused consent, and Det. Hanewinkel testified that he would have told the defendant that he did not have to give his consent. After the officers obtained the defendant's property bag, he identified his house key for them. At some later point, the defendant was given food which he ate while the search was conducted.

The detectives returned to the police station sometime before

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

2:00 p.m., and informed the defendant that they had seized a utility bill addressed to him and a box that contained .22 caliber ammunition. They did not question him, but the defendant stated that he had once owned a .22 caliber rifle. After replacing the house key in the defendant's property bag, the officers returned the defendant to the holdover.

The evidence does not support the defendant's assertion that his consent to the search of his house was coerced by the police. As the magistrate judge correctly analyzed, in determining whether consent is voluntary, both the defendant's characteristics and the environment in which the consent was given are to be considered. United States v. Chaidez, 906 F. 2d 377, 380-81 (8th Cir. 1990).

As to the defendant's characteristics, the evidence showed that the defendant was not impaired by drugs or alcohol when his consent was obtained; he did not exhibit or express any health problems[2]; he was advised of and understood his rights to remain silent and to counsel; he had likely eaten two meals, although he asked for food; he was allowed to review the consent to search form, but did not ask any questions about it; during an earlier interview, the defendant refused to consent to a gunshot residue test; he felt no reluctance in telling the police that he didn't want his door damaged; and he identified his house key for them,

_____

[2] The defendant asserts that he is diabetic, but there is no evidence that this condition was known to the officers or that it impaired his ability to voluntarily consent to the search.

8

apparently to enable them to enter without having to break in. With respect to the environment, the evidence showed that the officers did not threaten to get a search warrant if the defendant refused to consent to the search; the defendant had been subjected to a custodial interview that lasted for no more than 15 minutes on the preceding day; the detectives who sought the consent to search had not participated in the earlier interview; and, although the defendant was in custody, his handcuffs were removed. There is no evidence that the officers made any threats or promises to the defendant or that they told him that he had to give his consent. After considering the totality of the circumstances, along with the magistrate judge's thorough analysis, the Court concludes that the defendant voluntarily and intelligently consented to the search of his house. See Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973). Therefore, the evidence seized pursuant to the search will not be suppressed.

Likewise, the defendant's statement that he once owned a .22 caliber rifle will not be suppressed. The evidence establishes that this statement was not made in response to questioning by the police or in response to any actions by the officers that they knew were reasonably likely to elicit a statement. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997). Additionally, as discussed above, the defendant had been given the

9

<u>Miranda</u> warnings before he made the statement, and there is no evidence that the statement was prompted by unlawful or inappropriate police conduct.

**C.  <u>Search of residence at 1157 Howell on January 22, 2003</u>**

On January 21, 2003, FBI Special Agent Terry McGinnis obtained consent to search the house at 1157 Howell from its owner, Beverly Granberry.[3]  The search was conducted on January 22, 2003.  The defendant objects to the magistrate judge's conclusion that he lacks standing to challenge the search.

The Court concludes that the defendant had no legitimate expectation of privacy in the residence at the time of the search. <u>United States v. Gomez</u>, 16 F.3d 254, 256 (8th Cir. 1994).  Here, the defendant's lack of any possessory interest in the premises at the time of the search, his failure to exclude others from entering the premises, and his failure to take precautions to maintain privacy support the conclusion that the defendant had no subjective expectation of privacy and that no such expectation was objectively reasonable.  See <u>United States v. McCaster</u>, 193 F.3d 930, 933 (8th Cir. 1999); <u>United States v. Stallings</u>, 28 F.3d 58, 60 (8th Cir. 1994).

The evidence showed that Ms. Granberry obtained a court order

---

[3]  Several days earlier, Agent McGinnis had seized a firearm from the backyard of the residence (see discussion at **Part I.D.** infra).  He did not, however, tell Ms. Granberry about this when he requested her consent to search.

allowing her to evict the defendant on November 22, 2002. Prior to that date, the defendant had not paid any portion of the rent for approximately 8 months. His telephone was disconnected, and he failed to return any of Ms. Granberry's phone calls to him at work. The defendant did not respond to the oral and written notices of impending eviction that were communicated to him by Ms. Granberry. The defendant entered into a lease agreement which he knew obligated him to pay rent. In light of his failure to pay or to try to reach some accommodation with Ms. Granberry and given her threats to evict him, the defendant could not have had any reasonable expectation that his tenancy would be continued. On October 7, 2002, the defendant was arrested and thereafter remained in custody. Aside from the fact that the door was locked, no measures were taken by the defendant to secure the residence, which by December 2002 had been vandalized. The fact that the defendant retained a key to the house does not detract from the conclusion that he had no legitimate expectation of privacy. Pursuant to the court order, Ms. Granberry re-took possession of the residence in December 2002 and later changed the locks. Thus, the defendant lacks standing to challenge the search, and the evidence seized from the residence on January 22, 2003 will not be suppressed.

**D. Search of the yard at 1157 Howell on January 16, 2003**

On January 16, 2003, co-defendant Dominick Price informed Agent McGinnis that the gun used in the shooting was located in the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

backyard of the residence at 1157 Howell. Price stated that the defendant had placed the gun on the ground under some guttering on the left rear side of the house. This disclosure occurred during the course of a "proffer" interview in which the police were seeking to obtain information from Price about the crime. Prior to the proffer interview, Agent McGinnis had to 1157 Howell to view the area and to see if he could interview anyone in the neighborhood. He knocked on the door, but received no response, and it appeared to him that the house was vacant. He also spoke to a neighbor who told him that no one was living there anymore.

After receiving the information from defendant Price, Agent McGinnis drove to the residence and entered the backyard where he ultimately located a white plastic bag protruding from some guttering on the left rear side near a fence. He removed the bag, opened it, and found a loaded handgun. Agent McGinnis did not have a search warrant, but he testified that it was his intention to obtain one, regardless of what he might find in the yard. After seizing the gun, Agent McGinnis conducted no further search of the premises.

The defendant objects to the magistrate judge's conclusion that he lacked any expectation of privacy in the bag containing the firearm because he abandoned it. Warrantless searches of abandoned property do not violate the Fourth Amendment. <u>Abel v. United States</u>, 362 U.S. 217, 241 (1960). Whether abandonment has

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

occurred depends on an objective analysis all the facts and circumstances available to the investigating officers. United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999). Denial of ownership and physical relinquishment of the property are factors to be considered in the analysis. United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997), cert. denied, 552 U.S. 1601 (1998).

The evidence discussed in **Part I. C.** above supports the conclusion that the defendant abandoned the premises at 1157 Howell. Long before his arrest in October 2002, the defendant had stopped paying rent, and he had made no attempt to make other arrangements with Ms. Granberry to allow him to remain a tenant. Even though Ms. Granberry had allowed him to continue residing in the house without paying rent for a period of time, the notifications of forthcoming eviction put the defendant on notice that her goodwill had come to an end. Regardless of his intention to return to the residence on October 7, 2002, the date of his arrest, the defendant did not thereafter try to secure the residence or his belongings. With the abandonment of the residence, the defendant abandoned all personal property that remained there. The defendant disputes the magistrate judge's factual findings that the bag containing the gun "was not totally concealed" and that the defendant had hidden the gun in an apparent effort to disassociate himself from it. Whether the bag was partially or fully concealed or whether it was placed by the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

defendant in the location where it was found does not detract from the finding of abandonment.  Clearly, by the time of the search on January 16, 2003, possession of the premises had reverted exclusively to Ms. Granberry, the owner, and the defendant at that point had no reasonable expectation of privacy in the residence or the grounds.

The defendant also objects to the magistrate judge's conclusion that the "inevitable discovery" doctrine establishes an exception to the Fourth Amendment's warrant requirement in this case.  For the doctrine to apply, the government must show the existence of an "ongoing line of investigation distinct from the impermissible or unlawful technique" and must further show, by a preponderance of the evidence, a reasonable probability that the evidence would have been discovered through that line of investigation.  United States v. Villalba-Alvardo, 345 F.3d 1007, 1019-20 (8th Cir. 2003).  The Court agrees with the magistrate judge that the government met its burden in this case.  As discussed above, the law enforcement officials were continuing their investigation of the shooting by interviewing defendant Price and by returning to the Howell residence in the hope of finding someone to interview.  If, as defendant Price stated, the defendant had concealed the gun in the backyard, there was a reasonable likelihood that it was still there, as the defendant, who had been in custody since October 7, 2002, would not have had the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

opportunity to move it.   Additionally, Agent McGinnis testified that it was his intention to obtain a search warrant for the premises, regardless of whether he found anything there, and he had a good faith subjective belief that if the gun was there it would present a danger to public safety.  Based on the information known to law enforcement officials before the yard was searched, there was probable cause to support the issuance of a search warrant. Accordingly, the firearm will not be suppressed.

The United States objects to the magistrate judge's conclusion that the search of the backyard was not justified by exigent circumstances.   When probable cause and exigent circumstances exist, a warrantless search does not violate the Fourth Amendment. United States v. Walsh, 299 F.3d 729, 733 (8th Cir. 2002).  Exigent circumstances have been found to exist when there is a threat to public safety or to law enforcement officers.   Warden v. Hayden, 387 U.S. 294, 298-99 (1967).  Here, the government argues that the presence of the firearm in a partially unfenced yard in a densely populated residential area presented a threat to public safety such that exigent circumstances justified Agent McGinnis's search.

Although, as the magistrate judge found, Agent McGinnis had a credible subjective belief that the if firearm was in the yard it would present a danger to the public, the reasonableness of his action is to be measured by an objective standard.   Thus, the question is whether, under the circumstances that existed at the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

time, it was reasonable for Agent McGinnis to fear for his own safety of for the safety of others. See United States v. Kuenstler, 325 F.3d 1015, 1021 (8th Cir. 2003).

The Court agrees with the magistrate judge that the three cases cited by the government in its post-hearing memorandum are distinguishable in that all involved situations in which the police officers were at locations where they knew potentially dangerous firearms were present and they had concerns for their own safety and the safety of others who were also present. See United States v. Antwine, 873 F.2d 1144 (8th Cir. 1989)(after defendant pointed gun at them, agents seized gun from house where children were present); United States v. Hill, 730 F.2d 1163 (8th Cir. 1984) (after arriving to execute warrant to search for marijuana, police seized gun from house occupied by defendant and another man); United States v. Wells, 702 F.2d 141 (8th Cir. 1983)(police seized gun from defendant in tavern where other patrons present, after receiving tip from a tavern employee). In a supplement to its objections, the government cites United States v. Janis, 387 F.3d 682 (8th Cir. 2004), as further support for its exigent circumstances claim. The Court finds that this case is also distinguishable as it, too, involved actual knowledge by the police of the presence of firearms in a residence occupied by individuals other than the defendant. Here, Agent McGinnis had probable cause but no actual knowledge that the firearm was in the yard.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Additionally, he knew that the premises were vacant and, therefore there was no immediate danger of the defendant or anyone else obtaining control of the weapon. While the firearm, given its location, presented a potential danger to public safety, the immediacy of danger that was present in the cases cited by the government is not present here. Further, as the magistrate judge found, nothing prevented Agent McGinnis from securing the yard while a search warrant or the property owner's consent was obtained.

While it is not entirely clear, the government appears to contend that the backyard at 1157 Howell was not part of the curtilage and, therefore, not subject to Fourth Amendment protection. In support of this contention, the government points out that the yard was not fenced on one side, it was open to public view, and the defendant did not try to conceal the area from public view. See <u>United States v. Gerard</u>, 362 F.3d 484, 486 (8th Cir. 2004). It is undisputed, however, that the yard was immediately adjacent to the house and there was no barrier or other structure separating them. Thus, it would have been reasonable for an individual to expect that the backyard was part of the home. See <u>United States v. Dunn</u>, 480 U.S. 294, 300 (1987). Accordingly, the government's objections are overruled.

## II. <u>Defendant's Motion to Suppress Identification</u>

The defendant moves to suppress evidence of the identification

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

made by three witnesses who viewed him in a lineup. All of the witnesses had been present at or near the bank and saw the shooting take place. Approximately 5 or 6 hours after the incident, each witness separately viewed a lineup consisting of the defendant and three "foils," and each identified the defendant as the perpetrator. The defendant argues that the lineup procedure was unduly suggestive because a police officer referred to individuals in the lineup as "suspects," one witness was told by the police that they had "somebody there," a witness testified that he may have been told that someone had been arrested for the crime, and another witness was told, after making her identification, that the other witnesses had picked the same person. The defendant further asserts that the small number of "foils" in the lineups increased the likelihood of misidentification.

Identification procedures that are unnecessarily suggestive and that may lead to an irreparably mistaken identification violate due process. Stovall v. Denno, 388 U.S. 293 (1967). Because it is "the likelihood of misidentification which violates a defendant's right to due process," the focus is on the reliability of the identification evidence. Neil v. Biggers, 409 U.S. 188, 198 (1972). If the totality of circumstances indicates that the identification is reliable, then the evidence need not be excluded, even though the identification procedure was unnecessarily suggestive. Manson v. Braithwaite, 432 U.S. 98, 114 (1977).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Initially, the Court disagrees with the magistrate judge's rejection of the defendant's assertion that the individuals in the lineup were referred to as "suspects." At the suppression hearing conducted on March 6, 2003, Detective Jeffrey Stone testified about the instructions given to one of the witnesses as follows:

> **Q. And did you give her [witness Jeanne Coser] any specific instructions?**
>
> **A. No. Specific instructions about the lineup is that we tell her that the suspects are going to be numbered one through four, starting to her left, and if she sees anybody in that lineup that she recognizes, she is to tell us at that time.**

(March 6, 2003 Hearing Transcript, p. 89).

Later, Det. Stone testified that he could not recall whether he specifically used the term "suspects." To the extent the magistrate judge found that the term "suspects" was not used by the police in the lineup instructions given to Ms. Coser, the defendant's objection is sustained.

Nevertheless, the Court agrees that the lineups were not rendered impermissibly suggestive by the officers' use of the word "suspects" or by their telling the witnesses that they had "somebody there" or had arrested someone. See United States v. Bowman, 215 F.3d 951, 965-66 (9th Cir. 2000). Additionally, the fact that a witness was told that other witnesses had identified the same person did not make the procedure unduly suggestive. See Gregory-Bey v. Hanks, 332 F.3d 1036, 1046-47 (7th Cir. 2003)(photo array not impermissibly suggestive even though several photos of

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

defendant were repeatedly shown, a witness was told of another witness's identification, and police officer appeared happy when witness identified defendant).

Likewise, the number of "foils" or comparisons presented to the witnesses did not render the lineups impermissibly suggestive. Each lineup consisted of four individuals, including the defendant, and the lineup participants were presented as a group to each witness. While single photograph and single person show-up procedures may be impermissibly suggestive, nothing like those procedures was employed in this case.

The evidence shows that the witnesses were kept apart prior to viewing each lineup; they were told only to look at the individuals in the lineup and to tell the police if they recognized anyone; and they were not directed by the police to identify any particular individual in the lineups. After reviewing the totality of the circumstances in which the lineups were conducted, the Court concludes that none of the procedures employed by the police, singly or in combination, rendered the lineups impermissibly suggestive.

The defendant next objects to the magistrate judge's conclusion that the identifications were reliable. In assessing reliability, consideration must be given to (1) the witness's opportunity to view the defendant at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

accuracy of the witness's description of the defendant before the identification; (4) the witness's degree of certainty in making the identification; and (5) the length of time between the crime and the identification.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

Here, all three witnesses were present at or close to the scene of the shooting and saw it occur.  All of them saw the shooter, and one of them saw him more than once.  The witnesses' testimony establishes that they maintained consistent focus on what was happening in the hope of assisting in identifying the shooter later.  Also, each witness viewed the lineup within 5 or 6 hours after the crime occurred, and each was certain about the identification of the defendant as the perpetrator.  The witnesses gave physical descriptions of the shooter that contained minor variations in height and weight, but age ranges that varied from 19-25 years to 35-40 years[4].  The age differences, however, do not detract from the reliability of the identifications, especially in light of the fact that all three witnesses independently identified the same person.  See United States v. Rogers, 73 F.3d 774, 778 (8th Cir. 1996).

**III.  Conclusion**

Following *de novo* review of the record, and for the reasons

---

[4]  One witness, Jeanne Coser, testified that she told the police that the shooter was mid-30's to 40 years old and about 5'6'' tall, and that the description attributed to her in the police report of a younger, shorter man was incorrect.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

discussed above, the Court finds that the magistrate judge erred only in the finding that the police did not use the term "suspects" in referring to the individuals in the lineups. The Court concludes, however, that the evidence supports the magistrate judge's conclusions that the defendant's motions to suppress should be denied. Accordingly,

**IT IS HEREBY ORDERED** that the Report and Recommendation of United States Magistrate Judge Pertaining to Evidentiary Issues [Doc. #241] is **rejected** only as to the finding that the police did not refer to the individuals in the lineups as "suspects."

**IT IS FURTHER ORDERED** that the Report and Recommendation is in all other respects **sustained, adopted and incorporated herein.**

**IT IS FURTHER ORDERED** that the motions of defendant Robert Bolden, Sr. To suppress identification testimony [Doc. #70] and to suppress evidence and statements [Doc. #73] are **denied.**

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of October, 2005.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com